**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

---------------------------------------------------x

JOHN DOE,                                         |          Case No.
                                                 |
                    Plaintiff,                   |
        v.                                        |
                                                 |
MASSACHUSETTS INSTITUTE OF                        |
TECHNOLOGY,                                       |
                                                 |
                    Defendant.                    |

---------------------------------------------------x

## COMPLAINT AND JURY DEMAND

**PLAINTIFF JOHN DOE** ("John Doe," a pseudonym),[1] by his attorneys Nesenoff &
Miltenberg LLP, as and for his Complaint against DEFENDANT MASSACHUSETTS
INSTITUTE OF TECHNOLOGY ("MIT"), respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1.      This breach of contract, promissory estoppel and breach of contract/common law
denial of basic fairness/arbitrary and capricious decision-making suit is brought on behalf of
Plaintiff John Doe, who was expelled from MIT within a month of graduation for alleged sexual
misconduct that purportedly occurred over a year earlier and that he did not commit; the expulsion
was issued after an unfair process not in compliance with the MIT Student Code's commitment to
non-discrimination based on sex.

2.      In January 2016, John Doe was a third-year student at MIT on a three-year program.
On January 26, 2016, John Doe's former girlfriend "Jane Roe" (a pseudonym) filed a complaint
with MIT alleging nonconsensual sexual contact and nonconsensual sexual intercourse by John

---
[1] Plaintiff John Doe has filed herewith a motion to proceed by pseudonym.

Doe based on one night involving sexual intercourse on February 27, 2015, almost a year earlier than when the complaint was filed by Jane Roe with MIT 's Title IX Office. During the course of the investigation, MIT's investigators on its own initiative asserted a second charge against Doe, for sexual harassment, arising from the period of time when Doe was Roe's boyfriend in the 2013-2014 school year, two years prior to Roe's filing of the complaint with MIT's Title IX Office.

3.      Upon the filing of Jane Roe's disciplinary complaint, MIT's Title IX office launched an investigation, interviewing John Doe, Jane Roe and other students and reviewing various documents. Radical feminist anti-male bias on the MIT campus guided the investigation report's conclusions, which included that John Doe was responsible for (i) nonconsensual sexual contact and nonconsensual sexual intercourse based on the sex that occurred on February 27, 2015 and (ii) sexual harassment based on the period of time when John Doe was Jane Roe's boyfriend in the 2013-2014 school year. MIT presumed the female complainant's story to be true (which it wasn't), and presumed John Doe not to be truthful (which wasn't the case) in order to avoid being found responsible. Importantly, MIT failed to provide John Doe an opportunity to submit a written rebuttal to the investigation report.

4.      On April 25, 2016, MIT held a hearing before a panel of three professors. At the hearing, John Doe denied responsibility. Only two days later, on April 27, 2016, the Chair of the MIT Committee on Discipline sent John Doe a letter informing him that MIT found him responsible for nonconsensual sexual contact and nonconsensual sexual intercourse on February 27, 2015 and for sexual harassment during the time of the 2013-2014 school year and notified him that the sanction was expulsion -- in effect, rubber stamping the investigation report.

5.      Even though John Doe filed an appeal, arguing that the evidence did not support MIT's findings or the severe sanction of expulsion. MIT denied the appeal on May 13, 2016,

permanently expelling John Doe, just weeks shy of his graduation. John Doe, having experienced the losses resulting from having a disciplinary record he did not deserve and not having his diploma that he all but earned, brings this action to rectify the real damage to his life.

## THE PARTIES

6.     John Doe is a natural person who is a citizen of New Jersey, residing with his wife in Jersey City, New Jersey, while working as a software engineer. Until the MIT disciplinary proceeding that was brought as a result of Jane Roe's belated university complaint and that ended in expulsion, John Doe had an unblemished disciplinary record at MIT.

7.     MIT is an educational institution located in in the city of Cambridge, in the Commonwealth of Massachusetts, with a main address of 77 Massachusetts Avenue, Cambridge, Massachusetts 02139. MIT was incorporated in 1861. The self-stated mission of MIT is to advance knowledge and educate students in science, technology and other areas of scholarship, and MIT represents publicly that it seeks to develop in each member of the MIT community the ability and passion to work wisely, creatively and effectively for the betterment of humankind. The motto of MIT is "Mens et manus" ("Mind and hand"). As of October 30, 2019, MIT had 4,530 undergraduate students, approximately half of whom were women and half of whom were minority students. MIT has received and receives federal funding.

## JURISDICTION AND VENUE

8.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship: the Plaintiff John Doe is a citizen of the State of New Jersey and the Defendant MIT is a citizen of the State of Massachusetts.

9.     This Court has personal jurisdiction over MIT on the grounds that MIT is conducting business within the State of Massachusetts and is a resident of the State of

Massachusetts and that MIT's actions that are the subject of this action took place in the District of Massachusetts.

10.    Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

<u>**ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**</u>

A.    <u>**The Contract: MIT's Mind and Hand Book and Federal Regulation.**</u>

11.    At the time of John Doe's disciplinary case at MIT, the 2015 MIT Mind and Hand Book was in effect. The Mind and Hand Book was published by the MIT Division of Student Life and took its name from MIT's motto "Mens et manus," which is Latin for "Mind and hand." The Mind and Hand Book provided the standards, regulations and procedures to govern the behavior conduct of all undergraduate and graduate students.

12.    The Policies Regarding Student Behavior, Sexual Misconduct (p. 29) section of the 2015 MIT Mind and Hand Book, II (22) states:

> MIT is committed to providing a productive living and learning community in which students can pursue their educational goals. Sexual misconduct undermines this commitment and affects the ability of students to focus on their educational achievement. Therefore, MIT will not tolerate nor condone any form of sexual misconduct. MIT students are prohibited from engaging in sexual misconduct, as defined below. Moreover, MIT may take additional action in response to sexual misconduct as part of federal Title IX requirements (see http://titleix.mit.edu). No one shall be retaliated against for participating in the Institute's complaint resolution procedure in good faith as a complainant, a witness, an investigator, or in any other capacity.

13.    That same section of the 2015 MIT Mind and Hand Book continues on to define and outline consent (p. 30) as follows:

> Effective consent must be obtained for each instance and each escalation of sexual activity. Obtaining effective consent is the responsibility of the party initiating sexual activity. Doing otherwise may constitute sexual misconduct and is a violation of MIT policy. Effective Consent is:

• informed;
• freely and actively given;
• mutually understandable words or actions;
• which indicate a willingness to participate in
• mutually agreed upon sexual activity.

Further:

• Initiators of sexual activity are responsible for obtaining effective consent.
• Silence or passivity is not effective consent.
• The use of intimidation, coercion, threats, force, or violence negates any consent obtained.
• Consent is not effective if obtained from an individual who is incapable of giving consent due to one or more of the following or other reasons:
    • a mental, intellectual, or physical disability; or
    • is under the legal age to give consent; or
    • is asleep, unconscious, or physically helpless; or
    • is incapacitated by alcohol or other drugs.
• Consent to one type of sexual activity does not imply consent to any other or all types of sexual activity.
• A person can withdraw consent at any time.
• Consent to sexual activity at one time does not imply consent to the same or other sexual activity at any other time.
• Refusal, lack of consent, or non-consent may be expressed in many ways, verbally or physically. Physical resistance is not necessary to communicate a lack of consent. It is not necessary to resist physically or express verbally to indicate a lack of consent. It is the responsibility of the initiator of the sexual activity to obtain effective consent.

14.    The Policies Regarding Student Behavior, Sexual Misconduct (p. 31) section of the 2015 MIT Mind and Hand Book, II (22) states the following regarding consent and the capacity to do so:

In evaluating whether a person was incapacitated for purposes of evaluating effective consent, the Institute considers two questions: (1) Did the person initiating sexual activity know that their partner was incapacitated? and if not, (2) Should a sober, reasonable person in the same situation have known that their partner was incapacitated? If the answer to either of these questions is "yes," effective consent was absent.

15.    The Policies Regarding Student Behavior, Sexual Misconduct (p. 33) section of the 2015 MIT Mind and Hand Book, II (22) states:

Nonconsensual sexual contact is defined as any physical contact with another person of a sexual nature without that person's effective consent. The touching of a person's intimate parts (such as genitalia, groin, breast, buttocks, mouth, or clothing covering same); touching a person with one's own intimate parts; or forcing a person to touch another's intimate parts would be violations of this policy if they occur without effective consent.

Nonconsensual sexual penetration is defined as the sexual penetration of any bodily opening with any object or body part without effective consent. This could be committed by force, threat, intimidation, coercion, or through exploitation of another's mental or physical condition (such as lack of consciousness, incapacitation due to drugs or alcohol, age, or disability) of which the respondent was actually aware or which a reasonable person in the respondent's position should have been aware.

16.     The Policies Regarding Student Behavior, Sexual Misconduct (p. 32) section of the

2015 MIT Mind and Hand Book, II (22) states:

Sexual Harassment is unwelcome conduct of a sexual nature, such as unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature, when:

> • submission to such conduct is made either explicitly or implicitly a condition of an individual's employment or academic standing; or
> • submission to, or rejection of, such conduct is used as the basis for employment decisions (such as advancement, performance evaluation, or work schedule) or academic decisions (such as grading or letters of recommendation); or
> • such conduct has the purpose or effect of unreasonably interfering with an individual's working conditions, academic experience, or living conditions, or of creating a hostile working, academic, or living environment.

Even one instance of sexual harassment, if severe enough, may create a hostile environment. A non-exhaustive set of examples of conduct that might constitute sexual harassment are included below. One or more of these actions will be considered sexual harassment only when that conduct has the purpose or effect of unreasonably interfering with another individual's working conditions, academic experience, or living conditions, or of creating a hostile working, academic, or living environment. . . .

Examples of verbal sexual harassment may include unwelcome conduct such as unwelcome sexual flirtation, advances or propositions or requests for sexual activity or dates; asking about someone else's sexual activities, fantasies, preferences, or history; discussing one's own sexual activities, fantasies, preferences, or history; verbal abuse of a sexual nature; suggestive comments;

sexually explicit jokes; turning discussions at work or in the academic environment to sexual topics; and making offensive sounds such as smacking or licking lips, kissing sounds, or "wolf whistles."

Examples of nonverbal sexual harassment include unwelcome conduct such as displaying sexual objects, pictures or other images; invading a person's personal body space, such as standing closer than appropriate or necessary or hovering; displaying or wearing objects or items of clothing which express sexually offensive comments; making sexual gestures with hands or body movements; looking at a person in a sexually suggestive or intimidating manner; or delivering unwanted letters, gifts, or other items of a sexual nature. In addition, nonconsensual sexual contact, sexual exploitation, and nonconsensual sexual penetration may constitute nonverbal instances of sexual harassment.

17.    The Policies Regarding Student Behavior, MIT's Response (p. 34) section of the

2015 MIT Mind and Hand Book, II (22) states:

Except in those cases where the student has contacted a strictly confidential resource, the Institute will conduct a prompt, thorough, and impartial investigation and will take appropriate measures to terminate the misconduct, prevent its recurrence, and address its effects. This response may include formal disciplinary action, which may be instituted by an individual complainant or the Institute itself. The sanctions of disciplinary suspension and disciplinary expulsion will be strongly considered when a student is found to have violated any part of the nonconsensual sexual contact, nonconsensual sexual penetration, sexual exploitation, or retaliation provisions of this policy; and for severe violations of the sexual harassment provision.

18.    The Complaint and Disciplinary Procedures (p. 61) section of the 2015 MIT Mind

and Hand Book, VI, states:

Anyone—including individual students, faculty members, and employees of the Institute—may bring a formal complaint against a student to the Committee on Discipline (COD). The COD reviews cases of academic offenses, violations of Institute regulations and standards, and other infractions alleged to have been committed by students.

A formal complaint against a student must be submitted in writing to OSC. The charge and its documentation are transmitted to the chair of the COD. After a review of the documentation, the chair will decide whether or not a hearing by the COD is warranted, and, if so, what the appropriate forum will be. The COD has the authority to impose any sanction it deems appropriate. Possible sanctions include placing a letter in a student's disciplinary file, probation, suspension, and expulsion. Sanctions may also include educational and/or restorative components

meant to address the wrongdoing and serve the larger community. Detailed procedures for resolving complaints alleging that a student has violated MIT policies are available online at http://cod.mit.edu/rules and in print from the Office of Student Citizenship.

19.     The Resources, Committee on Discipline (p. 63) section of the 2015 MIT Mind and

Hand Book, VII (2), states:

The Institute's mission encourages students to explore in order to advance knowledge at the highest level. It also expects its students to uphold the highest standards of respect, integrity, and civility. With this context, the Committee on Discipline (COD) was created to resolve complaints of alleged violations of policies and/or community standards by a student or former student in a way that is objective and educational, not legalistic or adversarial.

The Rules and Regulations of the COD govern how cases of alleged misconduct by student shall be resolved. The rules are available online at http://cod.mit.edu and in print from the Office of Student Citizenship, W20-507, 617-253-3276, citizenship@mit.edu.

20.     The Policies Regarding Student Behavior, Sexual Misconduct (p. 27) section of the

2015 MIT Mind and Hand Book, II (18), states:

The Massachusetts Institute of Technology is committed to the principle of equal opportunity in education and employment. The Institute does not discriminate against individuals on the basis of race, color, sex, sexual orientation, gender identity, religion, disability, age, genetic information, veteran status, ancestry, or national or ethnic origin in the administration of its educational policies, admissions policies, employment policies, scholarship and loan programs, and other Institute administered programs and activities, but may favor US citizens or residents in admissions and financial aid.

21.     Title IX of the Education Amendments Act of 1972 provides in relevant part that

"[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be

denied the benefits of, or be subjected to discrimination under any education program or activity

receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX applies to all public and

private educational institutions that receive federal funds, including colleges and universities. MIT

is a recipient of federal funds and is therefore bound by Title IX and its regulations.

22.     On April 4, 2011, the Office for Civil Rights ("OCR") of the U.S. Department of Education ("DOE") sent a "Dear Colleague Letter" to colleges and universities (hereinafter referred to as the "April 2011 Dear Colleague Letter"). The "April 2011 Dear Colleague Letter," while now revoked, was in effect when MIT's disciplinary procedures were put in place and the alleged sexual assault occurred in this case. Before the 2011 Dear Colleague Letter, colleges and universities generally did not use its disciplinary procedures to adjudicate sexual misconduct cases and certainly not in the manner and frequency that they have since the issuance of the April 2011 Dear Colleague Letter. The April 2011 Dear Colleague Letter thus provides a necessary set of background facts to this action: http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html.

23.     Although the April 2011 Dear Colleague Letter marked a substantial change in OCR's position on how schools should handle disciplinary proceedings under Title IX, OCR did not conduct the public notice and comment process required for proposed regulations. See 5 U.S.C. § 553. The 2011 Dear Colleague Letter (p. 1) defined discrimination on the basis of sex to include sexual harassment of students, which was defined to include acts of sexual violence. The April 2011 Dear Colleague Letter provided that, in order to comply with Title IX, colleges and universities must have prompt procedures to investigate and resolve complaints of sexual misconduct.

24.     The press release announcing the April 2011 Dear Colleague Letter stated that it was "the first specifically advising schools, colleges and universities that their responsibilities under Title IX include protecting students from sexual violence" and that it included "new steps to help our nation's schools, universities and colleges end the cycle of sexual violence on campus." The press release made clear the focus was on protecting women: it stated that despite past progress

"the threat of violence and abuse continues for a new generation of women"; it lauded the "unprecedented coordination and cooperation across the federal government to combat violence against women"; it stated that one in five women "will be a victim of sexual assault during college" (a statistic that would later be thoroughly discredited that, if had it been true, would represent triple the rate of rape for the same demographic in war-torn Somalia)[2]; and it highlighted "the Administration's commitment to raising awareness and promoting policies to prevent sexual violence against women of all ages."

25.     The April 2011 Dear Colleague Letter itself explicitly focused on protection of women and effectively equated "victims" and "complainants" in sexual misconduct proceedings as women who must receive preferential treatment. For instance, the April 2011 Dear Colleague Letter: (i) stated -- incorrectly -- that "1 in 5 women are victims of completed or attempted sexual assault while in college" (p. 2); (ii) warned that "the majority of campus sexual assaults occur when women are incapacitated, primarily by alcohol" (p. 2); (iii) suggested educational institutions seek grants from the U.S. Department of Justice's Office on Violence against Women, which require institutions to "develop victim service programs and campus policies that ensure victim safety, [and] offender accountability . . ." (p. 19); and (iv) warned educational institutions that they must "never" view the "victim at fault for sexual violence" if she has been using "alcohol or drugs" and asks "schools to consider" providing students who violate alcohol or drug policies with amnesty if they allege they were sexually assaulted while consuming alcohol or drugs (p. 15).

26.     The 1 in 5 "statistic" cited by the April 2011 Dear Colleague Letter came from a disputed 2007 study, which was based on an overly broad definition of sexual assault and which, according to the study authors, was not derived from a nationally representative sample. Schow,

---

[2] Somalia Human Development Report, UN Development Programme, 2012, Table A4-28.

"No, 1 in 5 Women Have Not Been Raped on College Campuses," Washington Examiner, August 13, 2014, http://www.washingtonexaminer.com/no-1-5-women-have-not-been-raped-on-college-campuses/articles/2551980.

27.    A Bureau of Justice Statistics (DOJ) study, 1995-2013, published in December 2014 found that college-age female students on campus were less likely to be victims of sexual assault than non-students and the real number of college women assault victims is .03 in 5; these statistics do not support the notion of a "crisis" of violence against women. Rape and Sexual Assault Victimization among College Age Females, 1995-2013 (Special Report), U.S. Department of Justice, December 2014, http://www.bjs.gov.content/pub/pdf/ravcaf9513.pdf.

28.    The April 2011 Dear Colleague Letter, in order to provide females what was unjustified preferential treatment, imposed numerous mandates that inherently made it more difficult for males accused of sexual misconduct to defend themselves. The "April 2011 Dear Colleague Letter" (pp. 10-11) required schools to adopt a relatively low burden of proof -- the preponderance of the evidence ("more likely than not") -- in cases involving sexual misconduct, including sexual assault. Several colleges had been using "clear and convincing," and some, like Stanford University, applied the criminal standard, "beyond a reasonable doubt." The April 2011 Dear Colleague Letter (p. 12) also strongly discouraged allowing cross-examination of complainants because it "may be traumatic or intimidating" to the alleged victim. The "April 2011 Dear Colleague Letter" stated (p. 12) that schools should give both parties the right to appeal a decision, which amounts to double jeopardy for an accused student. After the April 2011 Dear Colleague Letter was published, schools changed their sexual assault and sexual harassment policies and procedures. Additionally, the "April 2011 Dear Colleague Letter" stated (pp. 15-16)

that schools should "minimize the burden on the complainant," transferring alleged perpetrators, if necessary, away from shared courses or housing.

29.     On April 29, 2014, the OCR published a document signed by then Assistant Secretary of Education in charge of the OCR Catherine E. Lhamon ("Secretary Lhamon") and bearing the title "Questions and Answers on Title IX and Sexual Violence." (the "2014 Q&A"): http://www2.ed/gov./about/offices/list/ocr/docs/qa-201404-title-ix.pdf. The 2014 Q&A continued OCR's effort to restrict students' ability to defend themselves by reducing or eliminating the ability to expose credibility flaws in the allegations made against them. For example, OCR's 2014 Q&A states that schools: (i) "must not require a complainant to be present" at sexual misconduct disciplinary hearings" (p. 30); (ii) may decide to eliminate all opportunities for "cross-examination" (p. 31); and (iii) must avoid "revictimization" by minimizing the number of times a victim is interviewed so "complainants are not unnecessarily required to give multiple statements about a traumatic event" (pp. 30, 38).

30.     Neither OCR's April 2014 Q&A nor the April 2011 Dear Colleague Letter were subject to notice-and-comment rule-making, yet both the OCR's April 2014 Q&A and the April 2011 Dear Colleague Letter constituted substantive decision-making.

31.     The Obama Administration, through the DOE and OCR, treated the April 2011 Dear Colleague Letter as binding on regulated parties for all practical purposes and thus has pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses. Then Secretary Lhamon, Assistant Secretary of the Department of Education ("DOE") in charge its Office for Civil Rights ("OCR"), delivered what was treated as marching orders by colleges and universities.

32.     In February 2014, Assistant Secretary Lhamon told college officials attending a conference at the University of Virginia that schools need to make "radical" change. According to the Chronicle of Higher Education, college presidents said afterward that there were "crisp marching orders from Washington." "Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases," Chronicle of Higher Education, February 11, 2014.

33.     In June 2014, then Assistant Secretary Lhamon testified at a Senate Hearing in that "some schools are still failing their students by responding inadequately to sexual assaults on campus. For those schools, my office and this Administration have made it clear that the time for delay is over." Assistant Secretary Lhamon stated at the Senate Hearing in June 2014 that "we do" expect institutions to comply with the 2011 Dear Colleague Letter. Assistant Secretary Lhamon told the Senate Committee, "This Administration is committed to using all its tools to ensure that all schools comply with Title IX . . ." She further told the Committee: "If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school." Assistant Secretary Lhamon additionally stood behind the "April 2011 Dear Colleague Letter."

34.     To revoke federal funds -- the ultimate penalty -- is a powerful tool because educational institutions receive billions of dollars a year from the federal government. Anne Neal of the American Council of Trustees and Alumni was quoted as follows: "There is a certain hysteria in the air on this topic, . . . It's really a surreal situation, I think." She explained that "schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead." "How Campus Sexual Assaults Came To Command New Attention," NPR, August 12, 2014.

35.     On October 27, 2014, MIT then Chancellor Cynthia Barnhart, a woman, issued a

letter to the MIT community reflecting the mentality of the April 2011 Dear Colleague Letter:

> In response to President Reif's charge that we take action to combat sexual assault at MIT, last spring my office conducted an online survey to understand the extent and effects of sexual misconduct in our community. I write now to share what we have learned so far and explain the first round of actions we are taking in response.
>
> The survey we created is the first of its kind for our community: we sent it to all undergraduate and graduate students (10,831 people), and we asked extensive, detailed questions designed to bring clarity to a subject that is inherently sensitive and difficult. We launched the survey on April 27, 2014, two days before the White House Task Force called on all US colleges and universities to survey their students on these matters.
>
> We received survey replies from 3,844 – or 35% – of our students. Because the survey was not a random sample and was voluntary, and the topic of unwanted sexual behaviors is focused, we know the results reflect a degree of self-selection. Since it is impossible to tell how this may have altered the results, it would be a mistake to use these numbers to generalize about the prevalence of unwanted sexual behavior in the lives of all MIT students.
>
> Nevertheless, the survey clearly tells us that, like many other colleges and universities, we face a serious problem:
>
> The national conversation has focused on the widely cited statistic that 19% of undergraduate women, or one in five, experience rape or sexual assault under conditions of force, threat or incapacitation. At MIT, for those female undergraduates who responded to the survey, the comparable figure is nearly 17%.
>
> Our survey asked questions designed to capture not only sexual assault by force, threat of harm, or incapacitation due to alcohol or drugs, but also to uncover a broader picture of unwanted sexual behavior in our community. Of all the students who responded to the survey -- graduate and undergraduate, of all genders -- 539 indicated that, while at MIT, they had experienced some type of unwanted sexual behavior, ranging from unwelcome verbal sexual conduct to rape, usually committed by someone they knew. Of those 539 respondents [to the survey], 284 were undergraduate women.

36.     The referenced survey was conducted and analyzed by eight women and one male

administrator at MIT:  https://web.mit.edu/surveys/casatips/index.html.  The survey describes

various efforts that took place just before the time of John Doe's case, including having a dedicated

Title IX office, hiring two new staff members to address gender-based inequities, setting up task forces to investigate sexual misconduct, and conducting marketing campaigns to advertise resources for alleged sexual assault victims.

37.     With this mentality and approach, which included acceptance of a false statistic of 1 in 5 college women being subject to sexual assault, MIT proceeded vigorously to prosecute male students accused of sexual assault.  MIT Chancellor Cynthia Barnhart, during her tenure, took pride in her efforts with respect to what was called combatting sexual misconduct.

38.     The Obama era procedures, however, led to litigation challenging what colleges and universities were doing in sexual misconduct proceedings in unfairly treating male respondents in violation of Title IX. *See Doe v. Columbia*, 831 F.3d 46 (2d Cir. 2016) (Title IX complaint upheld of male plaintiff who had been a suspended student as a result of university sexual misconduct proceeding).

39.     In September 2017, the DOE took first steps toward restoring procedures that would provide basic fairness to both accusing and accused students in Title IX proceedings. Recognizing the harmful results of the April 2011 Dear Colleague Letter, then Secretary of Education Betsy DeVos observed that "[n]o school or university should deprive any student of his or her ability to pursue their education because the school fears shaming by—or loss of funding from— Washington," that "no student should be forced to sue their way to due process," and that "[o]ne person denied due process is one too many." On September 7, 2017, then Department of Education Secretary Betsy DeVos denounced the campus sexual misconduct proceedings as denying due process in a manner that is wholly un-American: www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

40.     Then, on September 22, 2017, the Department of Education announced that it was withdrawing the 2011 Dear Colleague Letter and the 2014 Questions & Answers on Title IX Sexual Violence, noting in part the criticism of those documents for placing "improper pressure upon universities to adopt procedures that do not afford fundamental fairness" and are "overwhelmingly stacked against the accused." This withdrawal effected a reversion to 2001 Department of Education guidance, which reads in relevant part: "The Constitution also guarantees due process to students in public and State-supported schools who are accused of certain types of infractions. The rights established under Title IX must be interpreted consistent with any federally guaranteed due process rights involved in a complaint proceeding."

41.     Until Title IX regulations were issued in May 2020, many schools and universities continued to adhere to its Obama era procedures, including MIT. Meanwhile, then DOE Secretary DeVos had the DOE conduct notice and comment procedures of the Administrative Procedures Act on Title IX procedures for the sexual misconduct proceedings conducted by colleges and universities. According to then Secretary DeVos, one influential decision was *Doe v. Purdue*, 928 F.3d 652 (7th Cir. 2019), in which then Seventh Circuit Judge Amy Coney Barrett for a three-woman panel upheld a Title IX and due process complaint of a male student who had been a suspended student as a result of university sexual misconduct proceeding. After the Title IX regulations were finally issued in May 2020 to take effect in August 2020, colleges and universities did change their procedures. But all of those developments in Title IX post-dated the events of this case, which occurred in the 2013-2016 time period when the April 2011 Dear Colleague Letter was in effect.

**B.**   **John Doe's Disciplinary Case.**

42.   During the 2013-2014 school year at MIT, when John Doe and Jane Roe both were in their first year at MIT, John Doe and Jane Roe had a personal relationship that included their having regular sexual intercourse multiple times every week. It was the first serious relationship that John Doe had in his life; previously, he had been a virgin.

43.   Over the summer of 2014, Jane Roe broke off the relationship, but when the two returned to MIT for the 2014-2015 school year, they resumed seeing and interacting with each other and spending time together because they were in a number of the same classes and Jane Roe would go over to John Doe's residence hall room and get assistance with her class work, as Jane Roe struggled in her classes. John Doe hoped his assistance to Jane Roe would rekindle the romance of the relationship because he loved her. According to John Doe, in the first semester of the 2014-2015 school year, even though the two had broken up, John Doe and Jane Roe had consensual sexual intercourse on average about once a month and often at the initiation of Jane Roe. John Doe and Jane Roe agree that in November 2014, John Doe and Jane Roe had consensual sexual intercourse.

44.   On the night of February 26-27, 2015, Jane Roe went to John Doe's residence hall room with her laptop computer because John Doe was the only person whom she knew could fix the problems she was having. Jane Roe spent two to three hours in John Doe's room as he worked on her computer. During the course of the evening, John Doe kissed Jane Roe on her cheek or forehead a number of times.

45.   Because of the wintry weather conditions outside and because Jane Roe was tired from her studies, it was discussed and then agreed by Jane Roe and John Doe that Jane Roe would

stay the night in John Doe's room and sleep in his bed, which she did. John Doe joined her, and the two "spooned" while they both slept.

46.     In the early morning hours of February 27, 2015, John Doe woke up, used the bathroom and then when he returned to the bed and fell asleep for two hours. He woke up lying on his back and found Jane Roe resting her body on top of his. Jane Roe pushed her body into John Doe's, demonstrating a desire to engage in sexual intercourse. John Doe engaged in foreplay with Jane Roe, which she breathed heavily and made noises, reflecting that she was enjoying the pleasure of the foreplay. John Doe proceeded to remove items of Jane Roe's clothing with Jane Roe positioning herself to make such removal easier, for which she made noises in approval, and to give oral sex to Jane Roe and then to have sexual intercourse. Throughout the removal of clothing and sexual intercourse, John Doe observed Jane Roe as fully conscious, alert, and with wide open eyes. In fact, Jane Roe made moaning sounds, reflecting her enjoyment in the sexual act.

47.     Shortly after, Jane Roe asked John Doe what they did. John Doe, astonished at Jane Roe's question, stated they had sex. When Jane Roe left John Doe's room, Jane Roe did not appear upset at all. The only time the subject of the night of February 26-27, 2015 came up thereafter was in the following April 2015 at Jane Roe's sorority where John Doe went at Jane Roe's request to fix Jane Roe's computer; Jane Roe said to John Doe that the sex they had when she was asleep was not okay. But John Doe and Jane Roe had many interactions in 2015 after the night of February 26-27, 2015, both before and after the brief comment in April 2015 at Jane Roe's sorority, and despite many further interactions between John Doe and Jane Roe, John Doe heard nothing from Jane Roe about the night of February 26-27, 2015, until Jane Roe filed her university disciplinary complaint the following January 2016, nine months later.

48.     On January 26, 2016, John Doe's former girlfriend Jane Roe filed a complaint with MIT alleging nonconsensual sexual contact and nonconsensual sexual intercourse by John Doe based on one night involving sexual intercourse on February 27, 2015, almost a year earlier than when the complaint was filed by Jane Roe with MIT 's Title IX Office.

49.     Upon the filing of Jane Roe's disciplinary complaint, MIT's Title IX office launched an investigation, interviewing John Doe, Jane Roe and other students and reviewing various documents. The two investigators were women who expressed radical feminist attitudes. One of the investigators, who after graduating from law school, worked as a Victim Advocate at a Women's Center and then was employed as a Title IX investigator at MIT.

50.     At the first meeting with the investigators, the Title IX investigator specifically advised John Doe not to hire an attorney, stating that an attorney would not be any help since they would not be able to attend or speak at the investigation meetings and would be a waste of money. Instead, the Title IX investigator said they could provide a list of "trained" MIT advisors. The advisor that John Doe selected turned out to be a grad student advisor who contributed nothing to helping John Doe. At a second meeting with the investigators, the investigators spoke to John Doe in a manner indicating that they presumed John Doe not to be truthful, stating that they had "caught him" and asked him to clarify supposed contradictions in his account of the events of the morning which didn't exist.

51.     At the same time, the investigators did not explore any of the contradictions contained within complainant Jane Roe's story. Instead, during the course of the investigation, MIT's investigators on its own initiative asserted a second charge against John Doe -- sexual harassment by John Doe based on the period of time when John Doe was Jane Roe's boyfriend in the 2013-2014 school year, two years prior to Jane Roe's filing of the complaint with MIT's Title

IX Office. The MIT investigators conducted themselves as a roving commission seeking to ferret out supposed male sexual misconduct.

52.    Radical feminist anti-male bias on the MIT campus guided the investigation report's conclusions, which included that the female complainant's story was presumed to be true (which the evidence showed it wasn't) and that John Doe was presumed not to be truthful in order to avoid being found responsible (which the evidence showed wasn't the case). The investigators erroneously found John Doe responsible for (i) nonconsensual sexual contact and nonconsensual sexual intercourse based on the sex that occurred on February 27, 2015 and (ii) sexual harassment based on the period of time when John Doe was Jane Roe's boyfriend in the 2013-2014 school year. John Doe was not allowed to submit a written rebuttal to the investigation report.

53.    On April 25, 2016, MIT held a hearing before a panel of three professors, two of whom were women. The hearing panel had the investigation report but not a rebuttal from John Doe to the investigation report. At the hearing, John Doe denied responsibility. Only two days later, on April 27, 2016, the Chair of the MIT Committee on Discipline sent John Doe a letter informing him that MIT found him (erroneously) responsible for (i) nonconsensual sexual contact and nonconsensual sexual intercourse on February 27, 2015 and (ii) for sexual harassment during the time of the 2013-2014 school year and that the sanction was expulsion -- in effect, rubber stamping the investigation report.

54.    John Doe filed with MIT an appeal of the sanction, arguing that the evidence did not support the panel's findings and did not support the sanction of expulsion. As alleged above, John Doe had been a virgin before his relationship with Jane Roe. John Doe's appeal included the following:

> During the investigation, I explained . . . that I had effective consent because of [Jane Roe]'s actions and sounds before and during the event. These include her

responding to my question about returning to working on PSets (suggesting that she was, in fact, awake), her pushing her rear end into me while we were spooning, her lifting her rear end so that I could pull off her pants, and her lifting her shoulders so I could remove her bra. She also consistently made moaning sounds during the entire process, starting from the very beginning and continuing until it was over.

The rationale used by the COD [Committee on Discipline] and Title IX investigation in finding me responsible for misconduct is that a reasonable person should know that these actions do not constitute effective consent, because a person who is asleep can perform any of these actions. While I agree that this is true, it less likely that a person will perform *all* of these activities, within minutes of each other, as had happened that morning. Furthermore, what happened that morning was not unlike the way we initiated sex in the past. In the past, we never explicitly asked for consent, it was always inferred by actions and sounds that we made, such as moaning to indicate enjoyment and moving to assist with undressing. Therefore, I believe that, given the context of our previous sexual experiences, the way [Jane Doe] was moving on the bed, the sounds that she was making, and that all these were occurring at the same time, a reasonable person could also have concluded that [Jane Doe] was giving effective consent.

. . . [H]ad I known that [Jane Roe] was in fact asleep, I would certainly not have engaged in sexual activities with her. However, as I said in the previous paragraph, I truly thought I had effective consent. . . .

I feel that the COD [Committee on Discipline]'s decision to sanction me to expulsion is extreme. . . :

> 1)    Our sexual relationship never required verbal confirmations, and neither does MIT's policy. We have had sex hundreds of times before this incident, and many of them developed the same way as it had that morning. Based on this, I do not think it was unreasonable for me to have concluded that I had effective consent.

> 2)    There is no "indication that similar behavior could occur again," unlike what the COD [Committee on Discipline] is assuming. Since learning [Jane Roe]'s feelings after the incident, I have learned to always made sure to explicit ask for consent with my current girlfriend and will continue to do so for the rest of my life. This incident has shown me that it is possible to misinterpret signals, and doing so can have drastic consequences. To avoid anything like this from happening in the future, I will make sure to get explicit consent.

> 3)    One of the COD [Committee on Discipline]'s concerns and assumptions is that, even now, I "have not taken responsibility for [your] behavior or acknowledged the impact of [your] actions on the complainant." I want to point out that the notion of taking responsibility is more nuanced

21

than the yes or no answer that the committee was expecting me to give. As explained above, I truly thought I had effective consent. I was willing to take responsibility for making a terrible judgement call, but that is different from taking responsibility for sexual assault, which is what the COD [Committee on Discipline] was asking. Under MIT policy, sexual assault not only includes whether effective consent was given, but also whether a reasonable person would have perceived effective consent. I believe that there was sufficient evidence, given the context of hundreds of sexual experiences with [Jane Roe], to have assumed effective consent. Also, I did acknowledge the impact of my actions on [Jane Doe] to my advisor at the hearing, but I did not think the hearing was the right place to express those thoughts (I had been given the impression the hearing and investigations were purely factual).

55.    On May 13, 2016, MIT then Chancellor Cynthia Barnhart sent a letter to John Doe denying his appeal, stating without explanation that the responsibility finding was not substantially against the weight of the evidence and that expulsion was within the range of permissible sanctions.

56.    John Doe was thus expelled, just short of his expected graduation from MIT, with only final exams and final projects to complete. Based on John Doe's historic excellent academic performance at MIT, John Doe would have passed his final exams and projects with flying colors.

57.    John Doe has suffered and will continue to suffer significant damages as a result of MIT's finding of responsibility and expulsion.

58.    But for MIT's unwarranted sanction of expulsion, John Doe would have graduated with a diploma from MIT, a prestigious institution known for its academic rigor.

59.    As a result of MIT's flawed investigation, and resulting erroneous decision to expel John Doe, he has suffered from severe emotional distress and anxiety.

60.    Moreover, by marring John Doe's academic record with this expulsion, John Doe will experience reputational damage for years to come.

61.     This action has therefore been brought to rectify the breach of contract and promissory estoppel that has greatly damaged John Doe, including by the denial of the diploma John Doe had all but earned.

## FIRST CAUSE OF ACTION:
## State Law Breach of Contract

62.     John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

63.     An express and/or implied contract under Massachusetts law was created when John Doe accepted an offer of admission to MIT and paid the tuition and fees.

64.     It is well-established that the relationship between a student and his educational institution is contractual in nature, with the terms of contract established by the student handbook and other related policies. *See Doe v. W. New England Univ.,* 228 F. Supp. 3d 154, 169 (D. Mass. 2017); *Doe v. Brandeis Univ.,* 177 F. Supp. 3d 561, 593 (D. Mass. 2016).

65.     The 2015 MIT Mind and Hand Book has sections for sexual assault awareness and resources for alleged sexual misconduct complainants, but not for sexual misconduct respondents.

66.     The Rules and Regulations of the COD govern how cases of alleged misconduct by student shall be resolved. Among other things, the burden of proof is on the University to show that a violation has occurred before any sanctions are imposed.

67.     MIT breached its contract with John Doe when it failed to conduct an objective, impartial process and instead conducted a legalistic and adversarial process against a male respondent over events that involved a young man and young woman who had been in a personal relationship.  With respect to the allegation of nonconsensual sexual penetration, the events were 1¼ years old. With respect to the allegations of the nonconsensual sexual contact, the events were 2 years old.

23

68.     MIT breached its contract with John Doe when it did not adhere to the requirement of the burden of proof when presuming the female complainant's story was true (which the evidence showed it wasn't) and presuming John Doe was not truthful in order to avoid being found responsible (which the evidence showed wasn't the case).

69.     MIT breached its contract with John Doe when it did not adhere to the requirement of the burden of proof when the investigators and Hearing Panel found John Doe responsible for (i) nonconsensual sexual contact and nonconsensual sexual intercourse based on the sex that occurred on February 27, 2015 and (ii) sexual harassment based on the period of time when John Doe was Jane Doe's boyfriend in the 2013-2014 school year -- effectively disregarding the facts and circumstances presented to the investigators and the hearing panel by John Doe showing consent on the part of his former girlfriend with whom even after their break up he had continued to have sexual intercourse without complaint and indeed initiated by Jane Roe.

70.     MIT breached its contract with John Doe when it failed to afford John Doe an opportunity to submit a rebuttal to the investigation report. Without that rebuttal, the hearing panel had only the investigator report in writing and relatively quickly rubber stamped its conclusions.

71.     MIT breached its contract with John Doe when it permitted gender bias to be a motivating factor behind the expulsion imposed upon John Doe based on the allegations of the female Complainant Jane Roe concerning an alleged incident in February 2015 about which Complainant Jane Roe did not complain to the police ever and based on the charge not originally made by Jane Roe but developed by the investigators that John Doe had engaged in sexual harassment of sexual harassment during the period of time when John Doe was Jane Roe's boyfriend in the 2013-2014 school year. Gender bias is implicit in the imposition of an expulsion based on the female's allegations that were treated as presumptively true -- despite the lack of a

timely complaint, despite the lack of medical and physical evidence, and despite the contradictions in the female's own story. MIT maintained a female victim oriented disciplinary process for sexual misconduct that has been anti-male in operation because almost all complainants are female and almost all respondents are male and because MIT has provided ample resources to female complainants but none to male respondents.

72.     MIT breached its contract with John Doe by discriminating against John Doe on the basis of sex in violation of The Policies Regarding Student Behavior, Sexual Misconduct (p. 27) section of the 2015 MIT Mind and Hand Book, II (18), which states that MIT "is committed to the principle of equal opportunity in education and employment" and "does not discriminate against individuals on the basis of race, color, sex. . . ."

## SECOND CAUSE OF ACTION:
### Promissory Estoppel

73.     John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

74.     The 2015 MIT Mind and Hand Book contains unambiguous representations and promises that MIT should have reasonably expected to induce action or forbearance on the part of John Doe.

75.     MIT expected or should have expected John Doe to accept its offer of admission and choose not to attend other colleges based on its express and implied promises including, but not limited to: the opportunity to attain his educational objectives, to have his health, safety, welfare and human rights protected, to have any claims brought against him under the Policies be heard by an impartial and objective panel, to be free from discrimination, and to have complaints resolved impartially and promptly.

25

76.     John Doe reasonably and foreseeably relied to his detriment on these express and implied promises and representations made by MIT, by choosing to attend MIT rather than other schools of equal caliber.

77.     These express and implied promises and representations made by MIT must be enforced to prevent substantial injustice to John Doe.

78.     Based on the foregoing, MIT is liable to John Doe based on promissory estoppel.

79.     As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, damages to reputation, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

80.     As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**THIRD CAUSE OF ACTION:**
**Breach of Contract/Common Law: Denial of**
**Basic Fairness/Arbitrary and Capricious Decision-Making**

81.     John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

82.     Massachusetts courts have held that a private university may not act "arbitrarily or capriciously" in disciplining a student. *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 600 (D. Mass. 2016).

83.     "A covenant of good faith and fair dealing is implied in ever contract and a university has an obligation to adhere to this covenant when dealing with students." *Doe v. Harvard Univ.*, 462 F. Supp. 3d at 66 (citing *Doe v. Trs. of Boston Coll.*, 892 F.3d 67, 87 (1st Cir. 2018)).

84.     Specifically, "[s]chool disciplinary hearings must be "conducted with basic fairness." *Cloud v. Trustees of Boston University*, 720 F.2d 721, 725 (citing *Coveney v. President & Trustees of Holy Cross College,* 445 N.E.2d 136, 139 (1983); *Schaer v. Brandeis University*, 432 Mass. 474, 481, 735 N.E.2d 373, 380 (2000).

85.     Consistent with the implied covenant of good faith and fair dealing, the 2015 MIT Mind and Hand Book states its commitment to "resolve complaints of alleged violations" in a way that is "objective and educational" and not adversarial.

86.     MIT had a duty to ensure that proceedings against John Doe were conducted in good faith and basic fairness.

87.     While "'[b]asic fairness' is an uncertain and elastic concept, and there is little case law to serve as guideposts in conducting the fairness inquiry" (*Doe v. Brandeis Univ., 177 F. Supp. at 601*), "[i]n this context, at least, there are two principal threads to the "fairness" inquiry. The first is procedural fairness—that is, whether the process used to adjudicate the matter was sufficient to provide the accused student a fair and reasonable opportunity to defend himself. The second is substantive fairness—that is, even if the procedure was fair, whether the decision was unduly arbitrary or irrational, or tainted by bias or other unfairness. *Doe v. Brandeis,* 177 F.Supp. 3d at 602.

88.     MIT breached this duty of good faith and basic fairness when it failed to investigate and adjudicate the allegations in an objective and fair manner. By way of example and not limitation:

     a.     From the onset of the investigation, the investigators strongly dissuaded John Doe from hiring an attorney to serve as his advocate, thus stripping of his ability to put forth his best defense to combat the charges.

  b.  The investigators displayed rudeness and hostility towards John Doe during his interview.

  c.  The investigators presumed John Doe was not telling the truth.

  d.  The hearing panel rubber-stamped the investigation report.

89. Additionally, MIT did not afford Doe any opportunity at all to submit a rebuttal to the investigation report. Fairness warrants that the accused should have an opportunity to submit a response to any such report that would result in a sanction as severe as expulsion.

90. MIT further breached this duty when it forced John Doe to appear for a hearing, without an attorney advisor, after purposely dissuading him from doing so.

91. MIT further breached this duty when it found John Doe responsible for sexual misconduct, and expelled him, despite the substantial lack of evidence supporting such a finding and John Doe's vehement assertions of innocence.

92. Lastly, MIT denied Doe the right to an effective appeal by unreasonably circumscribing the grounds for appeal. ("Conspicuously absent from that list is the ability to appeal on the ground that the Special Examiner's decision was not supported by the evidence, or that it was otherwise unfair, unwise, or simply wrong." (*Doe v. Brandeis Univ.,* 177 F. Supp. 3d 561, 607 (D. Mass. 2016).)

93. In his appeal, among the procedural errors defined, John Doe described that the rationale utilized by MIT in dispensing the decision against him was wrong and illogical. John Doe highlighted that he indeed had affirmative consent, articulating exactly how so. He further reiterated that this in fact met the 2015 Mind and Hand Book's definition of consent.

94.     MIT Chancellor Cynthia Barnhart denied his appeal on May 13, 2016, with a perfunctory explanation that did not address the flawed rationale that resulting in the finding of responsibility and excessive sanction against John Doe.

95.     Based on the aforementioned facts and circumstances, MIT breached its express and/or implied contract with John Doe because MIT breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with John Doe. MIT failed its duty of good faith and fair dealing when it committed the procedural and substantive errors complained of above, meted out a disproportionate sanction and with a flawed process, found John Doe responsible despite the lack of evidence in support of Jane Roe's allegations of sexual misconduct.

96.     John Doe is entitled to recover damages for MIT's breach of the express and/or implied contractual obligations described above. As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, damages to reputation, psychological damages, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

97.     As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, John Doe demands judgment as follows:

(i)      on the first cause of action for breach of contract, a judgment against MIT awarding to John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career

29

prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

(ii)     on the second cause of action for promissory estoppel, a judgment against MIT awarding to John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and

(iii)    on the third cause of action for breach of contract/common law: denial of basic fairness/arbitrary and capricious decision-making, a judgment against MIT awarding to John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

(iv)    awarding John Doe such other and further relief as the Court deems just, equitable and proper.

## **JURY DEMAND**

Plaintiff John Doe demands a trial by jury of all issues presented herein that are triable by a jury.

Dated: December 16, 2021

Respectfully submitted,
**NESENOFF & MILTENBERG, LLP**

**By:** *Philip A. Byler*
**Philip A. Byler, Esq.**
(*pro hac vice forthcoming*)
**Andrew T. Miltenberg, Esq.**
(*pro hac vice forthcoming*)
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**
**pbyler@nmllplaw.com**
**amiltenberg@nmllplaw.com**


*/s/ Tara J. Davis*
**Tara J. Davis (BBO # 675346)**
**Regina Federico, Esq. (BBO # 700099)**
**NESENOFF & MILTENBERG, LLP**
**101 Federal Street, 19th Floor**
**Boston, MA 02110**
**212-736-4500**
**tdavis@nmllplaw.com**
**rfederico@nmllplaw.com**

*Attorneys for Plaintiff John Doe*