UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **JOHN DOE,**<br><br>*Plaintiff,*<br><br>v.<br><br>**MASSACHUSETTS INSTITUTE OF TECHNOLOGY,**<br><br>*Defendant.* | Civil Action No: 1:21-cv-12060-RGS |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS REQUEST FOR PSEUDONYM TREATMENT, IN LIGHT OF THE FIRST CIRCUIT'S NEW FOUR-PART TEST**

Plaintiff John Doe ("John Doe"), by his attorneys Nesenoff & Miltenberg, LLP, respectfully submits this Memorandum of Law in support of his request for pseudonym treatment per request of the Court (ECF No. 21), in light of the First Circuit's new four-part test set forth in *Doe v. Massachusetts Institute of Technology*, 46 F.4th 61, 2022 WL 3646028 (1st Cir. Aug. 24, 2022).

**I.      Factual Summary From John Doe's Complaint and Declaration.**

The facts relevant to John Doe's application for John Doe and the university complainant ("Jane Roe") are set forth in the Complaint (ECF 1) and in the accompanying Declaration of John Doe.

The nature of this case is stated in paragraphs 1 through 5 of the Complaint:

> 1. This breach of contract, promissory estoppel and breach of contract/common law denial of basic fairness/arbitrary and capricious decision-making suit is brought on behalf of Plaintiff John Doe, who was expelled from MIT within a month of graduation for alleged sexual misconduct that purportedly occurred over a year earlier and that he did not commit; the expulsion was issued after an unfair process not in compliance with the MIT Student Code's commitment to non-discrimination based on sex.

1

>    2. In January 2016, John Doe was a third-year student at MIT on a three-year program. On January 26, 2016, John Doe's former girlfriend "Jane Roe" (a pseudonym) filed a complaint with MIT alleging nonconsensual sexual contact and nonconsensual sexual intercourse by John Doe based on one night involving sexual intercourse on February 27, 2015, almost a year earlier than when the complaint was filed by Jane Roe with MIT's Title IX Office. During the course of the investigation, MIT's investigators on its own initiative asserted a second charge against Doe, for sexual harassment, arising from the period of time when Doe was Roe's boyfriend in the 2013-2014 school year, two years prior to Roe's filing of the complaint with MIT's Title IX Office.
>
>    3. Upon the filing of Jane Roe's disciplinary complaint, MIT's Title IX office launched an investigation, interviewing John Doe, Jane Roe and other students and reviewing various documents. Radical feminist anti-male bias on the MIT campus guided the investigation report's conclusions, which included that John Doe was responsible for (i) nonconsensual sexual contact and nonconsensual sexual intercourse based on the sex that occurred on February 27, 2015 and (ii) sexual harassment based on the period of time when John Doe was Jane Roe's boyfriend in the 2013-2014 school year. MIT presumed the female complainant's story to be true (which it wasn't), and presumed John Doe not to be truthful (which wasn't the case) in order to avoid being found responsible. Importantly, MIT failed to provide John Doe an opportunity to submit a written rebuttal to the investigation report.
>
>    4. On April 25, 2016, MIT held a hearing before a panel of three professors. At the hearing, John Doe denied responsibility. Only two days later, on April 27, 2016, the Chair of the MIT Committee on Discipline sent John Doe a letter informing him that MIT found him responsible for nonconsensual sexual contact and nonconsensual sexual intercourse on February 27, 2015 and for sexual harassment during the time of the 2013-2014 school year and notified him that the sanction was expulsion -- in effect, rubber stamping the investigation report.
>
>    5. Even though John Doe filed an appeal, arguing that the evidence did not support MIT's findings or the severe sanction of expulsion. MIT denied the appeal on May 13, 2016, permanently expelling John Doe, just weeks shy of his graduation. John Doe, having experienced the losses resulting from having a disciplinary record he did not deserve and not having his diploma that he all but earned, brings this action to rectify the real damage to his life.

(ECF 1: Complaint ¶¶ 1-5.)

According to the Complaint, John Doe is a natural person who is a citizen of New Jersey, residing with his wife in Jersey City, New Jersey, while working as a software engineer, and until the MIT disciplinary proceeding that was brought as a result of Jane Roe's belated university

complaint and that ended in expulsion, John Doe had an unblemished disciplinary record at MIT. (ECF 1: Complaint ¶ 6.)

Also, according to the Complaint, during the 2013-2014 school year at MIT, when John Doe and Jane Roe both were in their first year at MIT, John Doe and Jane Roe had a personal relationship that included their having regular sexual intercourse multiple times every week. It was the first serious relationship that John Doe had in his life; previously, he had been a virgin. Over the summer of 2014, Jane Roe broke off the relationship, but when the two returned to MIT for the 2014-2015 school year, they resumed seeing and interacting with each other and spending time together because they were in a number of the same classes and Jane Roe would go over to John Doe's residence hall room and get assistance with her class work, as Jane Roe struggled in her classes. John Doe hoped his assistance to Jane Roe would rekindle the romance of the relationship because he loved her. According to John Doe, in the first semester of the 2014-2015 school year, even though the two had broken up, John Doe and Jane Roe had consensual sexual intercourse on average about once a month and often at the initiation of Jane Roe. John Doe and Jane Roe agree that in November 2014, John Doe and Jane Roe had consensual sexual intercourse. (ECF 1: Complaint ¶¶ 42-43.)

On the night of February 26-27, 2015, Jane Roe went to John Doe's residence hall room with her laptop computer because John Doe was the only person whom she knew could fix the problems she was having. Jane Roe spent two to three hours in John Doe's room as he worked on her computer. During the course of the evening, John Doe kissed Jane Roe on her cheek or forehead a number of times. Because of the wintry weather conditions outside and because Jane Roe was tired from her studies, it was discussed and then agreed by Jane Roe and John Doe that

Jane Roe would stay the night in John Doe's room and sleep in his bed, which she did. John Doe joined her, and the two "spooned" while they both slept. (ECF 1: Complaint ¶¶ 44-45.)

In the early morning hours of February 27, 2015, John Doe woke up, used the bathroom and then when he returned to the bed and fell asleep for two hours. He woke up lying on his back and found Jane Roe resting her body on top of his. Jane Roe pushed her body into John Doe's, demonstrating a desire to engage in sexual intercourse. John Doe engaged in foreplay with Jane Roe, which she breathed heavily and made noises, reflecting that she was enjoying the pleasure of the foreplay. John Doe proceeded to remove items of Jane Roe's clothing with Jane Roe positioning herself to make such removal easier, for which she made noises in approval, and to give oral sex to Jane Roe and then to have sexual intercourse. Throughout the removal of clothing and sexual intercourse, John Doe observed Jane Roe as fully conscious, alert, and with wide open eyes. In fact, Jane Roe made moaning sounds, reflecting her enjoyment in the sexual act. (ECF 1: Complaint ¶ 46.)

When Jane Roe left John Doe's room, Jane Roe did not appear upset at all. The only time the subject of the night of February 26-27, 2015 came up thereafter was in the following April 2015 at Jane Roe's sorority where John Doe went at Jane Roe's request to fix Jane Roe's computer; Jane Roe said to John Doe that the sex they had when she was asleep was not okay. But John Doe and Jane Roe had many interactions in 2015 after the night of February 26-27, 2015, both before and after the brief comment in April 2015 at Jane Roe's sorority, and despite many further interactions between John Doe and Jane Roe, John Doe heard nothing from Jane Roe about the night of February 26-27, 2015, until Jane Roe filed her university disciplinary complaint the following January 2016, nine months later. (ECF 1: Complaint ¶ 47.)

John Doe's former girlfriend Jane Roe (a pseudonym) filed a complaint on January 26, 2016 with MIT. In her complaint, Jane alleged that John engaged in nonconsensual sexual contact and nonconsensual sexual intercourse under Title IX based on one night involving sexual intercourse on February 27, 2015, which occurred almost a year earlier than when Jane Roe filed her complaint with MIT's Title IX Office.  Upon the filing of Jane Roe's disciplinary complaint, MIT's Title IX office launched an investigation. The two investigators were women who expressed radical feminist attitudes. One of the investigators who after graduating from law school worked as a Victim Advocate at a Women's Center and then was employed as a Title IX investigator at MIT.  At the first meeting with the investigators, the Title IX investigator specifically advised John Doe not to hire an attorney and was instead assigned a grad student advisor who contributed nothing to helping John Doe.  At a second meeting with the investigators, the investigators spoke to John Doe in a manner indicating that they presumed John Doe not to be truthful.  At the same time, the investigators did not explore any of the contradictions contained within complainant Jane Roe's story.  Instead, during the course of the investigation, MIT's investigators on its own initiative asserted a second charge against John Doe -- sexual harassment by John Doe based on the period of time when John Doe was Jane Roe's boyfriend in the 2013-2014 school year, two years prior to Jane Doe's filing of the complaint with MIT's Title IX Office. The MIT investigators conducted themselves as a roving commission seeking to ferret out supposed male sexual misconduct.  (ECF 1: Complaint ¶¶ 48-51.)

The Complaint alleges that radical feminist anti-male bias on the MIT campus guided the investigation report's conclusions, which included that the female complainant's story was presumed to be true (which the evidence showed it wasn't) and that John Doe was presumed not to be truthful in order to avoid being found responsible (which the evidence showed wasn't the

case). The investigators erroneously found John Doe responsible for (i) nonconsensual sexual contact and nonconsensual sexual intercourse based on the sex that occurred on February 27, 2015 and (ii) sexual harassment based on the period of time when John Doe was Jane Roe's boyfriend in the 2013-2014 school year. John Doe was not allowed to submit a written rebuttal to the investigation report. (ECF 1: Complaint ¶ 52.)

On April 25, 2016, MIT held a hearing before a panel of three professors, two of whom were women. The hearing panel had the investigation report but not a rebuttal from John Doe to the investigation report. At the hearing, John Doe denied responsibility. Only two days later, on April 27, 2016, the Chair of the MIT Committee on Discipline sent John Doe a letter informing him that MIT found him (erroneously) responsible for (i) nonconsensual sexual contact and nonconsensual sexual intercourse on February 27, 2015 and (ii) for sexual harassment during the time of the 2013-2014 school year and that the sanction was expulsion -- in effect, alleges the Complaint, rubber stamping the investigation report. (ECF 1: Complaint ¶ 53.)

John Doe filed with MIT an appeal of the sanction, arguing that the evidence did not support the panel's findings and did not support the sanction of expulsion. MIT denied the appeal on May 13, 2016, rendering John permanently expelled, just weeks shy of his graduation. John Doe, having experienced the losses resulting from having a disciplinary record he did not deserve and not having his diploma that he all but earned, brought this action forward to rectify the damage done to his life. (ECF 1: Complaint ¶¶ 54-61; John Doe Declaration ¶ 24.)

The Complaint (ECF No. 1) in this action involves personal matters that are highly sensitive in nature, namely, the disclosure of the sexual activities of John Doe and Jane Roe. Neither Jane Roe nor John Doe want to have the personal details of the case, heretofore kept confidential in MIT's disciplinary process, made public. (John Doe Declaration ¶¶ 6, 30.)

John Doe is particularly vulnerable to severe harm if his name were to be disclosed publicly while he seeks to clear his record of the sexual assault and harassment findings during MIT's disciplinary proceedings. The added reputational damage would severely harm his current and future career opportunities. He may lose the job that he currently has and excels at. The false and exaggerated allegations that he faced could also lead to additional public shame and harassment. Additionally, the disclosure of John Doe's identity would also cause the revelation of the true identity of Jane Roe, an "innocent non-party" to this action. (John Doe Declaration ¶¶ 26-27.)

**II.   John Doe Meets the Categories Set Forth by the First Circuit, and He Should Be Permitted, Along With Jane Roe, to Proceed Under a Pseudonym.**

In its decision, the First Circuit set forth "four general categories of exceptional cases in which party anonymity ordinarily will be warranted[,]" several of which Plaintiff John Doe falls squarely within. *Doe v. Mass. Inst. of Tech.,* 46 F.4th 61, 2022 WL 3646028 at 7 (1st Cir. Aug. 24, 2022). The categories outlined by the First Circuit include the following: (i) the revelation of the identity of the party seeking pseudonym treatment would cause severe harm; (ii) innocent non-parties would be harmed by the identification of the party seeking anonymity; (iii) the lack of anonymity would have a chilling effect on similarly situated potential future litigants; and (iv) whether an underlying proceeding to the litigation received confidential treatment, notably with school disciplinary proceedings, as the "public has an abiding interest in ensuring that the values underpinning the confidentiality protections imposed by FERPA and Title IX are not subverted by collateral attacks in federal court." *Id.* at 7-10, 12.

**A.  The First Category: The Revelation of John Doe's Identity Would Cause Severe Harm.**

The First Circuit found that use of a pseudonym would be permitted if "a would-be Doe…reasonably fears that coming out of the shadows will cause him severe harm." *Id.* Examples

given by the First Circuit include but are not limited to: (i) disclosure of a history of sexual abuse; (ii) fear of an extraordinary retaliatory measure such as arrest, deportation, or imprisonment; (iii) recovering from a long-term disorder; and (iv) retaliation in the form of physical or mental harm. *Id.* at 7 (internal citations omitted).

As noted above, John Doe is vulnerable to severe harm if his name were to be disclosed publicly while he seeks to clear his record of the sexual assault and harassment findings during MIT's disciplinary proceedings. If required to disclose his identity, John Doe will suffer the exact type of harm that he seeks to avoid by commencing this lawsuit, as it would effectively force him to "come out of the shadows." *Id.* For instance, he will suffer reputational damage because he will be forced to, as the First Circuit articulated, "disclose[]…a history of sexual abuse"—forever branding him as a perpetrator of a sexual assault which he did not commit. *Doe v. Mass. Inst. of Tech.,* 2022 WL 3646028 at 7. The added reputational damage would severely harm his current and future career opportunities. He may lose the job that he currently has and excels at. The false and exaggerated allegations that he faced could also lead to additional public shame and harassment. (John Doe Declaration ¶ 26.)

Any simple internet search of his name would reveal the unsupported allegations. Should John successfully achieve his goal of removing the false allegation from his record, the accusation would *still* remain in the public realm. The mere accusation alone, even with a full removal, would have a devastating impact upon John. *See Doe v. Purdue Univ.*, 321 F.R.D. 339, 342 (N.D. Ind. 2017)*, citing Doe v. Colgate University,* 2016 WL 1448829, at *3 (N.D.N.Y. Apr. 12, 2016) ("If Plaintiff's identity is revealed, Plaintiff would suffer the very harm to his reputation that he seeks to remedy by bringing this lawsuit; in other words, if Plaintiff is successful in proving that the charges of sexual misconduct against him were unfounded and that Defendants' procedures

violated his due process rights, the revelation of Plaintiff's identity "would further exacerbate the emotional and reputational injuries he alleges."); *Doe v. Trustees of Dartmouth Coll.,* 2018 WL 2048385, at *6 (D.N.H. May 2, 2018) ("Plaintiff has a reasonable fear that, whatever the outcome of the action, public identification will subject him to severe reputational harm and harassment, and will defeat the very purpose of this litigation.")

Moreover, it is no secret that employers are well acquainted with societal concerns related to issues of this nature and would therefore hesitate to employ someone with this type of accusation, irrespective of the ultimate result of this litigation.

### B. The Second Category: Innocent Non-Parties Would Be Harmed By The Disclosure of John Doe's True Identity Being Made Public.

The second category that the First Circuit identified for considering pseudonym treatment asks whether non-parties would be harmed by the identification of the party seeking pseudonym treatment. *Id.* An example given by the First Circuit involved "granting pseudonym status to parents in litigation involving their minor children." *Id.* (internal citations omitted). The First Circuit found John's argument in support of this category to be on point because the identity of Jane Roe, a non-party, would be revealed should John Doe's identity become public. *Id.* at 9.

This factor likewise weighs in Doe's favor because the identity of Jane Roe would be revealed should John be forced to reveal his identity. *Id.* Jane Roe is an "innocent non-party" as defined by the First Circuit, as she is not a party to the present action. *Doe v. Mass. Inst. of Tech.,* 2022 WL 3646028 at 9. As observed by the District Court in *Doe v. Trustees of Dartmouth College,* "[e]ven more salient to the court is [the complainant's] interest in anonymity. Should plaintiff be publicly identified, [complainant] would likely be identified as well, and [complainant] has a stronger case for anonymity. Unlike a litigant, who in using the courts must be prepared to accept the public scrutiny that is an inherent part of public trials, [complainant] is a nonparty . . . [g]iven

9

the underlying facts of this case, in conjunction with the evidence presented by the parties, the court finds reasonable plaintiff's and [complainant's] fears relating to public identification." *Doe v. Trustees of Dartmouth Coll.*, 2018 WL 2048385, at *6 (D.N.H. May 2, 2018) (internal citations and quotations omitted). Similarly, the public revelation of Doe's identity in this action will necessarily result in the revelation of the complainant's identity. This factor warrants permitting the Plaintiff to proceed pseudonymously.

### C. The Third Category: Anonymity for John Doe Is Necessary To Prevent A Chilling Effect on Similarly Situated Potential Future Litigants.

The third category that the First Circuit found that pseudonym treatment may be allowed is in cases where concealing the true identity of a party is necessary to prevent a chilling effect on similarly situated potential future litigants. *Id.* at 8; citing *Doe v. Megless*, 654 F.3d 404, 410 (3d Cir. 2011). The First Circuit explained that it must be wary of the deterring effect on those who seek redress through civil litigation because that is the avenue though which they can seek "peaceful resolution of disputes." *Doe v. Mass. Inst. of Tech.,* 2022 WL 3646028 at 8. Representative "typical" cases identified by the First Circuit included, for instance, those involving sexual activities, bodily autonomy, reproductive rights, and those in which "the injury litigated against would be incurred as a result of the disclosure of the [party's] identity[.]" *Id.* (internal quotations omitted). (John Doe Declaration ¶ 29.)

The removal of confidentiality in any such proceeding may have a chilling effect on future litigants. When balancing anonymity against the public interest, the First Circuit declared that the "public has an abiding interest in ensuring that the values underpinning the confidentiality protections imposed by FERPA and Title IX are not subverted by collateral attacks in federal court." 2022 WL 3646028 at 12. The First Circuit also stressed that disclosure of student identities in litigation may deter reporting or participation in such university disciplinary processes. *Id*.

John Doe's situation falls squarely under both the third category identified by the First Circuit in *Doe v. Mass. Inst. of Tech*. The revelation of John's identity would have an impact on similarly situated future litigants because they would be deterred from seeking peaceful resolution through litigation should they be required to reveal their identities. John Doe brought this action to dissociate his name from the false and damaging allegations launched against him by the University. Both John and future litigants would incur the injury litigated against—namely, reputational damage and the consequences that flow therefrom as a result of the false allegations of sexual assault. John's situation is representative of a "typical" case defined by the First Circuit because the disclosure of his sexual activity would be inevitable should his name be revealed, and this disclosure would cause Doe to sustain the exact harm that he seeks to rectify through this litigation. 2022 WL 3646028 at 8.

### D. The Fourth Category: The Underlying Proceeding Received Confidential Treatment.

The First Circuit also identified a fourth category where pseudonym use could be allowed; specifically, when a proceeding that plays a role in the litigation received confidential treatment. 2022 WL 3646028 at 9. Examples of such a confidential proceeding would include family and/or juvenile court records. *Id.* The First Circuit highlighted that Congress, and the Executive Branch, gave "careful thought" to Title IX proceedings and stated that "[c]onfidentiality is an important aspect of that vision." *I*2022 WL 3646028 at 10. To underscore the sentiment, the First Circuit pointed out that Congress enacted the Family Educational Rights and Privacy Act of 1974 ("FERPA") to "prevent educational institutions from unilaterally disclosing 'sensitive information about students.'" *Id.* (internal citations omitted). Student disciplinary records typically fall under this protection. *Id.* The First Circuit also pointed out that Title IX requires that the identities of those filing complaints of sex discrimination, as well as those accused, are to be kept confidential

11

by recipient institutions. *Id.* Importantly, the First Circuit acknowledged that "[i]t is evident…that federal law aims to keep such proceedings largely under wraps" and that such background cannot be ignored. 2022 WL 3646028 at 11.

The fourth category also applies to the instant matter as the proceedings conducted by MIT, most notably the hearing, were kept confidential. As discussed above, both FERPA and Title IX aim to protect the confidentiality of students, and as such, John's identity, as well as the other non-party students involved, should remain concealed. Sensitive information that Title IX and FERPA aim to safeguard, such as student disciplinary and conduct records, would be revealed should John's name be made public. 2022 WL 3646028 at 10. Consequently, depriving Doe of pseudonym status would make any school proceeding, most notably Title IX proceedings, susceptible to challenges against their confidentiality and integrity. Contrarily, permitting a pseudonym order in this matter would preserve the status quo, allowing university disciplinary processes to remain confidential. The revelation of John's identity would also go directly against the First Circuit's direction that the identities of those filing complaints of sex discrimination (in this case, Jane Roe), as well as those accused (here, John Doe), are to be kept confidential. *Id*.

### E. The Categories Are Not Exhaustive and Other Factors Are Implicated Here.

The First Circuit cautioned that these categories are not exhaustive nor do they constitute the "entire universe" of situations where a pseudonym may be appropriate. 2022 WL 3646028 at 8. Additionally, the First Circuit stated that these categories, also fashioned as paradigms, are "rough cuts" and that many cases may fall under several of the categories, which should be taken into account when determining whether pseudonym treatment should be given. *Id.* Such is the case with John Doe because, as demonstrated above, the instant matter falls under several categories outlined by the First Circuit.

One such additional factor favoring pseudonymity cited and discussed by the District Court in *Doe v. Purdue Univ.,* 321 F.R.D. at 343, is that the university defendants would not be impeded in their defense from allowing the plaintiff in that case to proceed under a pseudonym. Here, Defendant is already aware of John Doe's true identity and will have an unobstructed opportunity to litigate this matter. John Doe's Declaration attests to the lack of prejudice to MIT from pseudonym treatment.  (John Doe Declaration ¶ 28.)  The lack of prejudice to the defendant university as a factor favoring pseudonymity is also recognized by other Courts: *Doe v. Colgate University,* 1448829, at *3 ("The Court further finds that Defendants will not be prejudiced by allowing Plaintiff to proceed anonymously.. . . Defendants are aware of Plaintiff's true identity and will have an uninhibited opportunity to litigate this matter regardless of whether Plaintiff's identity is disclosed publicly."); *Doe No. 2 v. Kolko,* 242 F.R.D. 193, 198 (E.D.N.Y. 2006) ("[o]ther than the need to make redactions and take measures not to disclose plaintiff's identity, Defendants will not be hampered or inconvenienced merely by Plaintiff's anonymity in court papers.")

Another consideration favoring pseudonymity, which was also discussed by the District Court in *Doe v. Purdue Univ,* 321 F.R.D. at 343 (emphasis added), is that:

> the public interest will continue to be served as the record in this case will not be sealed and the legal and procedural rulings in this case will remain a matter of public record. The courtroom proceedings will remain open, subject to the least intrusive means possible of protecting the identities of the parties and witnesses. *The actual identities of Plaintiff and his accuser are of minimal value to the public.*

Finally, due process is a factor favoring pseudonymity in the circumstances of a challenge to a university sexual misconduct proceeding, a point made by in *Doe v. Colgate University,* 1448829, at *2:

> Recently, cases stemming from investigations of sexual abuse on college and university campuses have garnered significant media attention, posing the risk of further reputational harm to both the plaintiffs in these cases and their accusers. . . . the Court finds that protecting the anonymity of sexual assault victims and those

13

accused of committing sexual assault can be an important safeguard to ensure that the due process rights of all parties are protected.

### III. Conclusion.

For the reasons set forth above, including but not limited to the irreparable harm that Plaintiff would incur should his identity be disclosed, John respectfully requests that this Court permit him to proceed under a pseudonym in the instant action.

Dated: Boston, Massachusetts
October 3, 2022

> Respectfully submitted,
> **NESENOFF & MILTENBERG, LLP**
> *Attorneys for Plaintiff John Doe*
> **By: /s/** *Philip A. Byler*
> **Philip A. Byler, Esq. (*pro hac vice*)**
> **Andrew T. Miltenberg, Esq.**
> **(*pro hac vice* forthcoming)**
> **363 Seventh Avenue, Fifth Floor**
> **New York, New York 10001**
> **(212) 736-4500**
> **pbyler@nmllplaw.com**
> **amiltenberg@nmllplaw.com**
>
> **By: /s/** *Tara J. Davis*
> **Tara Davis, Esq. (BBO # 675346)**
> **Regina M. Federico, Esq. (BBO #700099)**
> **101 Federal Street, Nineteenth Floor**
> **Boston, Massachusetts 02110**
> **(617) 209-2127**
> **tdavis@nmllplaw.com**
> **rfederico@nmllplaw.com**

### CERTIFICATE OF SERVICE

The document was served electronically upon all counsel of record filing through the ECF system on October 3, 2022.

> */s/ Tara J. Davis*
> Tara J. Davis