UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOHN DOE,<br><br>*Plaintiff*,<br><br>v.<br><br>MASSACHUSETTS INSTITUTE OF<br>TECHNOLOGY,<br><br>*Defendant*. | Civil Action No. 1:21-cv-12060-RGS<br><br>***Leave to File Brief over 20 Pages***<br>***Granted on December 5, 2023***<br>***(ECF No. 43)*** |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Scott A. Roberts (BBO No. 550732)
*sroberts@hrwlawyers.com*
HIRSCH ROBERTS WEINSTEIN LLP
24 Federal Street, 12th Floor
Boston, MA 02110
Phone: (617) 348-4300
Fax: (617) 348-4343


*Counsel for Defendant Massachusetts*
*Institute of Technology*

Dated:  December 8, 2023

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND .............................................................................................. 3

    A.    Roe's Complaint................................................................................................. 3

    B.    The MIT Policies Implicated by Roe's Complaint ........................................ 4

    C.    MIT's Investigation of Roe's Complaint ....................................................... 6

    D.    Doe Reviews the Investigation Report and Recommended Findings and Seeks a Hearing ....................................................................................................... 12

    E.    The Hearing before the Panel of the COD's Sexual Misconduct Subcommittee, and the Panel's Decision and Sanctions........................................................ 14

    F.    Doe's Appeal .................................................................................................. 18

ARGUMENT ...................................................................................................................... 20

    A.    Standard of Review ......................................................................................... 20

    B.    The Reasonable Expectations and Basic Fairness Tests ............................. 20

    C.    The Court Should Grant Summary Judgment on Doe's Breach of Contract Claim (Count I).................................................................................................... 22

    D.    The Court Should Grant Summary Judgment on Doe's Promissory Estoppel Claim (Count II) ..................................................................................................... 29

    E.    The Court Should Grant Summary Judgment on Doe's Basic Fairness Claim (Count III) ....................................................................................................... 30

CONCLUSION..................................................................................................................... 36

# TABLE OF AUTHORITIES

**Cases**

*Cloud v. Trustees of Boston Univ.*, 720 F.2d 721 (1st Cir. 1983) ................................... 27

*David v. Neumann Univ.*, 187 F. Supp. 3d 554 (E.D. Pa. 2016) ................................... 28

*Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561 (D. Mass. 2016) ......................................... 20, 29, 30

*Doe v. Brown Univ.*, 210 F. Supp. 3d 310 (D.R.I. 2016) ................................................ 25

*Doe v. Phillips Exeter Acad.*, No. 16-cv-396, 2016 WL 6651310 (D.N.H. Nov. 10, 2016) ......... 25

*Doe v. Stonehill Coll.*, 55 F.4th 302 (1st Cir. 2022) .......................................................... 21, 25, 30

*Doe v. Trustees of Boston Coll.*, 892 F.3d 67 (1st Cir. 2018) ......................................... 20, 21, 29

*Doe v. W. New Engl. Univ.*, 228 F. Supp. 3d 154 (D. Mass. 2017) ............................... 25

*Doe v. Williams Coll.*, 530 F. Supp. 3d 92 (D. Mass. 2021) ...................................... 21, 22, 25, 34

*G. v. Fay School, Inc.*, 931 F.3d 1 (1st Cir. 2019) ......................................................... 28

*Leader v. President & Fellows of Harvard Coll.*, No. 16-10254, 2018 WL 3213490
  (D. Mass. June 29, 2018) ................................................................................ 20

*Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353 (S.D.N.Y. 2016) ......................... 28

*Schaer v. Brandeis Univ.*, 432 Mass. 474 (2000) ....................................................... 25

*Sonoiki v. Harvard Univ.*, No. 19-CV-12172, 2020 WL 3416516 (D. Mass. June 22, 2020) ....... 30

**Rules**

Fed. R. Civ. P. 56(a) ...................................................................................................... 20

## INTRODUCTION

In the Spring of 2016, a three-member panel of the Committee of Discipline ("COD") at Massachusetts Institute of Technology ("MIT" or the "Institute") determined that Plaintiff John Doe ("Doe") had violated the Institute's Sexual Misconduct Policy by initiating nonconsensual sexual contact and nonconsensual sexual intercourse with his former girlfriend Jane Roe ("Roe"), without obtaining her effective consent and while she was nearly asleep, and that he violated MIT's Harassment Policy based on what he called a "bit controlling" course of conduct during their relationship as first year students. Based on these findings, MIT expelled Doe, a decision that he unsuccessfully appealed to MIT's Chancellor. More than five years later, Doe filed this action, asking this Court to re-adjudicate the Institute's decision and expunge its sanction. This Court should decline the invitation.

MIT was required to follow its procedures and policies as it would reasonably expect a student to understand them, and in a way that provided basic fairness. That is precisely what MIT did: it provided notice of allegations to Doe and advised him of his right to have an advisor accompany him to all meetings; it interviewed Doe three times during the Institute's investigation and afforded him multiple opportunities to review and respond to evidence gathered during the Institute's investigation, including through review of both draft and final investigation reports; it provided him a live hearing before the COD, consistent with his request; and, after the COD's carefully considered decision came out against him, it provided him a full opportunity to appeal.

In his Complaint, Doe seeks to contest the Institute's disciplinary proceedings, asserting claims for breach of contract (Count I), promissory estoppel (Count II), and violation of basic fairness (Count III), none of which is supported by the actual evidence or the law. Among other things, Doe contends that the Institute did not adhere to its "burden of proof" when it found him

responsible for violating the Institute's policies, but the facts show that the COD's decision was amply supported by the evidence. Critically, the COD's conclusion that Doe had failed to obtain effective consent from Roe was largely based on the *acceptance* of Doe's own testimony, and not on any presumption that he had been untruthful. Doe contends that the Institute did not let him submit a "written rebuttal" to the final investigation report, but the Institute's policies do not provide for a "written rebuttal," and Doe never sought to submit a "written rebuttal" in any event (and, of course, he was permitted to "rebut" the findings of the investigation report at the live hearing). Doe claims that his expulsion was motivated by "gender bias," but he repeatedly admitted at his deposition that there is no evidentiary basis for that allegation. Doe claims that he was "dissuaded" from using an attorney as his advisor—he offered four different stories on this point during this case—but the evidence shows that Doe knew that he could use an attorney as an advisor, and that Doe chose to have a non-attorney serve as his advisor (and then chose to not use the advisor during the investigation). Doe's remaining allegations, e.g., that the COD "rubber-stamped" the investigation report and that his grounds for appeal were "unreasonably circumscrib[ed]," are demonstrably wrong and do nothing to advance his claims.

MIT understands that Doe is disappointed with how his time at MIT ended, but the undisputed facts conclusively establish that MIT complied with the Institute's policies and conducted its proceedings with fairness to Doe and Roe. For these reasons, Doe's claims fail as a matter of law, and MIT requests that the Court enter summary judgment in its favor.

# FACTUAL BACKGROUND[1]

### A.   Roe's Complaint

On January 26, 2016, Jane Roe submitted a complaint to MIT's Title IX Office ("Roe's Complaint"), in which she alleged that John Doe, her ex-boyfriend, had raped her on the morning of February 27, 2015 (the "February 2015 Incident") and that he had engaged in controlling and sometimes violent behavior during the 2013–2014 academic year, when Roe and Doe had been in a relationship (the "Harassment Allegations").  SUF at ¶¶ 1–2.

Regarding the February 2015 Incident, Roe reported that she went to Doe's dormitory in the late evening to address some issues with her computer, and that she ended up falling asleep because she had "pulled an all-nighter the night before."  *Id.* at ¶ 1.  Roe then described what reportedly occurred the next morning, stating:

> In the morning I awoke to my pants being off and [Doe] giving me oral sex.  Half awake and half in shock, I was vaguely aware of what was going on, but couldn't get my body to do anything about it. By the time I was fully awake, he was penetrating me vaginally.  I pushed him off, got up, put my clothes on and asked if he used a condom, which he said no.  I then asked him why he didn't ask first, and after he avoided the question I left immediately.

*Id.*

Regarding the Harassment Allegations, Roe reported that when she and Doe were in a relationship as first-year students during the 2013–2014 academic year, Doe engaged in problematic behavior towards her.  *Id.* at ¶ 2.  Roe reported that at the end of her first semester, she obtained assistance from MIT's Violence Prevention & Response office ("VPR") to put "some space" between herself and Doe, stating:

---

[1]     This Factual Background is drawn from the Statement of Undisputed Material Facts in support of Defendant's Motion for Summary Judgment (the "SUF"), filed concurrently with this Memorandum.  Citations throughout this Memorandum to the "Roberts Aff." refer to the Affidavit of Scott A. Roberts and citations to "Rankin Aff." refer to the Affidavit of Sarah Rankin, both filed simultaneously with this Memorandum.  References to "Exhibit ___" refer to the numbered exhibits to the Roberts Aff. and the Rankin Aff.

> . . . I spoke to my [Graduate Resident Tutor] about my relationship [with Doe] and
> they referred me to VPR.  With an advocate I decided to move to an all-female
> dorm, . . . to give myself some space.  While moving helped initially, within a few
> weeks he was living in my room again.  He guilted me into letting him stay by
> saying if I loved him 'enough' then I should want to have him over all the time.

*Id.* at ¶ 2.  Roe reported that during her second semester, she "tried to make some new friends

and wanted to get more involved on campus," but that Doe resisted her efforts.  *Id.* at ¶ 2.  Roe

reported:

> [Doe], however, didn't like this and was very reluctant to let me go out or participate
> in other activities.  Every time I left my room without him he would argue with me
> over being out too long and I had to text him every hour if I wasn't with him.  When
> I tried to spend some time in my friend's [sic] rooms, after a while he would call
> me and demand I go back to my room, one time even coming to my friend's room
> to see if I was still there.  At one point, he even put an app on my phone that showed
> him my GPS location.  Mid-semester I wanted to join a sorority, which he refused
> to allow me to do and we argued about it often.  When we argued, he would
> frequently break and throw things around the room (i.e., his phone, water bottles).
> Even after I joined a sorority against his wishes, I was still not allowed to attend
> mixers nor formals.

*Id.*

### B.  The MIT Policies Implicated by Roe's Complaint

The allegations in Roe's Complaint implicated in relevant part two MIT policies, namely

(1) MIT's 2014–2015 Sexual Misconduct Policy, which was in effect at the time of the February

2015 Incident (the "Sexual Misconduct Policy"), and (2) the Harassment Policy set forth in the

2013–2014 Mind and Hand Book, which was in effect during the 2013–2014 academic year (the

"Harassment Policy").  *Id.* at ¶¶ 3–4.

The Sexual Misconduct Policy prohibited MIT students "from engaging in sexual

misconduct," including "nonconsensual sexual contact" and "nonconsensual sexual penetration."

*Id.* at ¶ 5.  The Sexual Misconduct Policy defined "nonconsensual sexual contact" as "any

physical contact with another person of a sexual nature without that person's *effective consent*,"

and defined "nonconsensual sexual penetration" as "the sexual penetration of any bodily opening

with any object or body part without *effective consent*." *Id.* at ¶ 6 (original emphasis).  The

Sexual Misconduct Policy provided that the party initiating sexual activity was responsible for

obtaining "effective consent," which the policy defined as "informed; freely and actively given;

mutually understandable words or actions; which indicate a willingness to participate in mutually

agreed upon sexual activity." *Id.* at ¶ 7.  The Sexual Misconduct Policy further specified that

"[c]onsent to sexual activity at one time does not imply consent to the same or other sexual

activity at any other time," that "[s]ilence or passivity is not *effective consent*," and that

"[c]onsent is not effective if obtained from an individual incapable of giving consent" because

the individual is "asleep, unconscious, or physically helpless."  *Id.* at ¶ 8 (original emphasis).

The Sexual Misconduct Policy provided that a person who was asleep was in a "[s]tate[] of

incapacitation" and thus lacked the physical and/or mental ability "to make informed, rational

judgments and decisions."  *Id.* at ¶ 9.  The Sexual Misconduct Policy stated that if a student is

found to have violated the Institute's policies against nonconsensual sexual contact or

nonconsensual sexual penetration, the "sanctions of disciplinary suspension and disciplinary

expulsion will be strongly considered."  *Id.* at ¶ 10.

　　　　The Harassment Policy provided that "[h]arassment of any kind is not acceptable

behavior at MIT," and the policy defined "harassment" as "any conduct, verbal or physical, on or

off campus, that has the intent or effect of unreasonably interfering with an individual's or

group's educational or work performance at MIT or that creates an intimidating, hostile, or

offensive education, work, or living environment." *Id.* at ¶ 11.  The Harassment Policy stated

that engaging in harassment may "lead to sanctions up to and including termination of . . .

student status." *Id.* at ¶ 12.

### C.    MIT's Investigation of Roe's Complaint

During the 2015–2016 academic year, MIT's COD Rules and Regulations set forth the process for addressing and investigating complaints of sexual misconduct. *Id.* at ¶ 13. The COD Rules and Regulations provided that an investigation included, "at a minimum, the respondent receiving written notice of the situation and both the complainant and the respondent having an ability to meet with the investigator, an opportunity to submit written statements, and an opportunity to respond to the facts and statements gathered during the investigation." *Id.* at ¶ 14. In Doe's case, all occurred.

### 1.    MIT Notifies Doe of the Situation, and Doe Selects an Advisor

On February 2, 2016, MIT's Title IX Coordinator, Sarah Rankin ("Ms. Rankin"), emailed Doe and informed him that the Title IX Office had received an allegation that Doe had violated the Sexual Misconduct Policy and would be conducting a fact-finding inquiry regarding Roe's Complaint (the "Investigation"). *Id.* at ¶ 15. Ms. Rankin attached the Sexual Misconduct Policy to her email, provided Doe a link to the COD Rules and Regulations, and identified provisions that would govern the disciplinary process. *Id.* at ¶ 16. Ms. Rankin's email also stated that Doe was "entitled to an advisor of [his] choice who may accompany [him] to any meetings, interviews, or related proceedings," but that Doe's advisor "may not actively participate in such proceedings." *Id.* at ¶ 17. Before his meeting with Ms. Rankin on February 4, 2016, Doe reviewed the section of the COD Rules and Regulations that explained that attorneys could serve as advisors in "cases involving allegations of sexual misconduct," and that advisors "may attend meetings, hearings, or sanctioning panels with their student and may give support and advice, but are not permitted to serve as a witness, make arguments on behalf of or represent students, question students, or author documents." *Id.* at ¶¶ 18–19.

On February 4, 2016, Doe met with Ms. Rankin to discuss the Investigation (Doe did not bring or ask to bring an advisor to the meeting). *Id.* at ¶¶ 18, 20. During this meeting, Ms. Rankin reiterated that Doe could have an advisor of his choosing and that the advisor could be an attorney. *Id.* at ¶ 21. Ms. Rankin also told Doe that the next step would be to schedule a meeting with the investigators, Jamie Sinetar ("Ms. Sinetar") and Elizabeth McCarthy (collectively, the "Investigators"). *Id.* at ¶ 23. After Doe's meeting with Ms. Rankin, she emailed him a summary of their discussion and provided him with a list of MIT staff who had received training on the Title IX and COD processes and were available to serve as advisors, including Joshua Gonzalez ("Mr. Gonzalez"), the Area Director for MIT's Simmons Hall, where Doe was then residing. *Id.* at ¶ 24. On February 8, 2016, Doe informed Ms. Rankin that he had asked Mr. Gonzalez to be his advisor. *Id.* at ¶ 25.

2.   The Investigative Interviews of Roe and Doe

During the Investigation, the Investigators interviewed Roe three times. *Id.* at ¶ 26. The Investigators also interviewed Doe three times and asked him questions about allegations that had been made by Roe and gave him the opportunity to respond to those questions. *Id.* at ¶ 27. Below is a summary of information obtained during the Investigation regarding the February 2015 Incident and the Harassment Allegations from both parties, to which each party had an opportunity to respond.

a.   *Information Provided by Roe During Her Investigative Interviews*

Regarding the February 2015 Incident, Roe reported that after addressing issues with her computer for several hours during the late evening of February 26, 2015, she was very tired and asked Doe "if it was ok if she took a nap." *Id.* at ¶ 28. Doe agreed, and Roe fell asleep in Doe's bed, fully clothed. *Id.* at ¶ 29. Roe, who described herself as a "very heavy sleeper," reported that early on the morning of February 27, 2015, she "partially awoke and was 'vaguely aware'

that someone had taken off her pants," that she eventually realized that Doe was performing oral sex on her, and that by the time she was "fully waking up," Doe was penetrating her vaginally with his penis. *Id.* at ¶ 30.  Roe reported that once she was fully awake, she was "really freaked out," sat up quickly, and then "got up really quickly and got her clothes on." *Id.* at ¶ 31.  Roe reported that "the first thing she was able to say was to ask [Doe] if he had used a condom," and that "he replied no." *Id.* at ¶ 32.  Roe reported that she then asked Doe "why he had not asked her first" and left Doe's room. *Id.* at ¶ 33.

Regarding the Harassment Allegations, Roe described a "very suffocating" relationship with Doe during the 2013–2014 academic year. *Id.* at ¶ 34.  During their first semester, Doe began staying in Roe's room every night after she suffered a medical incident. *Id.* at ¶ 35.  Roe reported that whenever Roe asked Doe to stay in his own room, Doe argued with her "over a long period of time," which sometimes involved Doe "throwing things around." *Id.* at ¶ 36.  Roe reported that if she did not text Doe every hour when she was out, he would become "very angry" and engage in "an interrogation" about why she had not texted him. *Id.* at ¶ 37.  Roe reported that when she wanted to join a sorority, Doe argued with Roe for "multiple days" and begged her not to join. *Id.* at ¶ 38.  Roe reported that during arguments, Doe would throw and break things and occasionally hit himself. *Id.* at ¶ 39.  Roe reported that Doe installed a GPS application on her phone that showed her location, telling her that "if she loved him then she should like it." *Id.* at ¶ 40.  Roe reported that while she was visiting a friend's room and discussing how she was "feeling suffocated" by Doe, Doe showed up at the room and told Roe's friend, "She needs to come back." *Id.* at ¶ 41.

### b.  Doe Responds to Information Gathered During the Investigation

On February 10, 2016, Ms. Sinetar emailed Doe to schedule an initial interview and reminded him that he was "welcome to have [his] advisor accompany [him] to this meeting." *Id.*

at ¶ 42.  On February 12, 2016, Doe informed Ms. Sinetar that he was "planning to come alone to the initial interviews," without his advisor.  *Id.* at ¶ 43.

On February 17, 2016, Doe met with the Investigators for his first interview (the "First Interview").  *Id.* at ¶ 44.  On February 19, 2016, Ms. Sinetar emailed Doe a draft statement of his First Interview and invited him to provide any revisions, clarifications, or additional information. *Id.* at ¶ 45.  On February 24, 2016, Doe replied: "I've read through the statement that you sent, and have added a few comments.  It seems pretty accurate."  *Id.* at ¶ 46.  Ms. Sinetar incorporated all of Doe's comments and finalized the statement regarding the First Interview (the "First Interview Summary").  *Id.* at ¶ 47.

Doe's First Interview focused on his account of the February 2015 Incident.  Among other things, the First Interview Summary reflects that Doe reported:

- Roe came to Doe's room on February 26, 2015, because she "needed help on a homework assignment," but Doe and Roe did not complete the assignment.
- Doe "may have offered to have [Roe] spend the night."  Doe and Roe fell asleep on his bed between 1:00 and 2:00 a.m., with Roe "fully dressed."
- When Doe awoke, Roe was lying next to him.  Doe asked Roe if she was ready to go back to the assignment, and she said "no."
- A minute later, Doe "felt like [Roe] was 'trying to snuggle closer' but was squishing him."  Doe "wasn't sure what [Roe] was trying to do after that."[2]
- Doe put his hand on Roe's rear end, over her pants, and stroked it for approximately 15–20 seconds.  Roe "made a moaning kind of sound."  Doe then "slipped his hand" down the back of Roe's pants and touched the skin of her rear end.  Roe "continued to make sounds."
- Doe touched Roe's vagina and clitoris.  Based on "sounds" from Roe, Doe "thought she was enjoying it and wanted [him] to continue."  Doe digitally penetrated Roe.[3]

---

[2]     Doe offered differing descriptions of the positioning of Roe's body on his bed.  He initially asserted that Roe was facing him, with her upper body resting on his chest and shoulder.  Rankin Aff., Exhibit 9 thereto, Doe's First Interview Summary at 66.  Later, he asserted that Roe was "pushing [her] rear end into [him]," i.e., that she was facing away from him.  *Id.*  For her part, Roe stated during her second interview that she was "laying prone" and not "spooning" with Doe. Rankin Aff., Exhibit 9 thereto, Roe's First Interview Summary at 62.

[3]     Doe asserted that Roe said "oh, yes" at this point (the only words he reported her using).  Rankin Aff., Exhibit 9 thereto, Doe's First Interview Summary at 66.  In her second interview, however, Roe responded to Doe's description of her alleged vocalizations and said that she did "not recall making any sounds or utterances during or preceding the sexual contact."  Rankin Aff., Exhibit 9 thereto, Roe's Second Interview Summary at 62.  Roe further stated that the "oh yes" comment "sticks out because that is not something [she] would say."  *Id.*  Roe then added,

- Doe then undressed Roe.  Roe "lifted her bottom so [he] could remove her pants and lifted her shoulders so [he] could take off her bra."[4]  Roe "centered herself" on the bed.
- Doe got on top of Roe, "quick[ly]" kissed her mouth, and penetrated Roe's vagina with his penis.  Roe's "eyes were closed when he penetrated her and 'remained closed the entire time.'"  Roe "remained in the same position" while Doe was penetrating her and "did not say anything" but "made pleasured sounds."
- Approximately 10–20 minutes later, Roe turned to Doe and asked him, "Did we have sex?"  Doe said "yes."
- Roe got up, got dressed said to Doe, "I was asleep."  Doe asked Roe, "How could you have been asleep?"  Roe responded, "I was asleep" and left Doe's room.

*Id.* at ¶ 48.

On March 3, 2016, Doe met with the Investigators for his second interview (the "Second Interview"), and Ms. Sinetar prepared a summary of that interview (the "Second Interview Summary").  *Id.* at ¶ 49.  Ms. Sinetar explained that some of the behaviors alleged by Roe "could result in other conduct charges" but that Doe would "have the opportunity to read [Roe's] statements during [the Second Interview]."  *Id.* at ¶ 50.[5]  During the Second Interview, Doe responded to the Harassment Allegations regarding his interactions with Roe during the 2013–2014 academic year.  *Id.* at ¶ 51.  Among other things, the Second Interview Summary reflects that Doe reported:

- Doe felt that he "should be the first priority" for Roe when they were in a relationship, and "felt like [Roe] ignored [him] most of the time when [they] weren't together."
- Doe put a GPS tracking app on Roe's phone, and he "assume[d]" that he did this because he felt she "needed it" because she had previously been hospitalized.

---

"Upon reviewing it, that entire section sounds very intimate, as it is written it sounds like the most intimate of any sexual encounter we have had, even when we were in a relationship."  *Id.*

[4]     Roe's Complaint contradicted Doe's assertion that she had enabled him to remove her clothes.  SUF at ¶ 1 ("In the morning I awoke to my pants being off and [Doe] giving me oral sex.  Half awake and half in shock, I was vaguely aware of what was going on, but couldn't get my body to do anything about it").  Moreover, in her second interview, Roe stated that during any previous sexual encounters with Doe, she "would always take [her] own clothes off."  Rankin Aff., Exhibit 9 thereto, Roe's Second Interview Summary at 62.  She added, "So to me, if I am keeping my clothes on, I am not inviting you to touch me."  *Id.*

[5]     In his Complaint, Doe alleges that the Investigators "on its [sic] own initiative asserted a second charge against John Doe—sexual harassment by John Doe based on the period of time when John Doe was Jane Roe's boyfriend in the 2013–2014 school year."  Compl. at ¶ 51.  This is not correct, as Roe's Complaint and initial interview raised the Harassment Allegations.

- Doe argued with Roe when she wanted to attend a social event at her sorority that he "did not want her to attend."
- During an argument, Doe broke his phone when he "went to throw [his] phone onto the bed and [he] missed and it hit the wall and broke."
- During an argument, Doe "hit[] his leg with his fist [on] one or two occasions."

*Id.* at ¶ 52.

On March 8, 2016, Doe met with the Investigators for his third and final interview (the "Third Interview"), and Ms. Sinetar prepared a summary of that interview (the "Third Interview Summary").[6]  *Id.* at ¶ 55.  During the Third Interview, Doe responded to statements by Roe regarding the February 2015 Incident and the Harassment Allegations.  *Id.* at ¶ 56.  Among other things, the Third Interview Summary reflects that Doe reported:

- Regarding his relationship with Roe during the 2013–2014 academic year, Doe was "sure there were many things that [he] should not have done" but he "never had any intention to harm her."
- A few weeks after the February 2015 Incident, Roe told Doe that she had been asleep and "that what [Doe] did was not ok."

*Id.* at ¶ 57.

### c.  Doe Declines Opportunity to Review Investigation Materials.

On March 15, 2016, Ms. Sinetar emailed Doe and offered him "an opportunity to review the notes from [Roe's] third interview, notes from [Ms. Sinetar's] interviews with the witnesses and materials submitted by the witnesses."  *Id.* at ¶ 60.  On March 17, 2016, Ms. Sinetar emailed Doe to confirm that they would be meeting on March 18, 2016, and suggested that Doe may want to consider having his advisor accompany him to this meeting "as students often find it

---

[6]      On March 7, 2016, Ms. Sinetar sent an email to Doe asking whether he had had an opportunity to connect with his advisor and inquired about scheduling a follow-up interview.  SUF at ¶ 53.  Doe replied with his availability and stated: "I have yet to meet with [my advisor], but I think I'll be good to go in on my own to the followup [sic] interview."  *Id.* at ¶ 54.  During the Investigation, Ms. Rankin heard from the Investigators that Doe was attending his interviews without an advisor, and she reached out to Doe's advisor, Mr. Gonzalez, about this topic.  *Id.* at ¶ 58.  On March 14, 2016, Mr. Gonzalez sent an email to Ms. Rankin that stated, "I reached out to [Doe] but he keeps informing me that he is fine and at this time does not need me to attend any meetings with him.  I will keep checking-in with him."  *Id.* at ¶ 59.

particularly helpful to have support during this stage of the investigative process." *Id.* at ¶ 61.

Doe responded, "I think I'll skip over this," and stated his understanding was that they would

meet again once all of the documents were finalized. *Id.* at ¶ 62. Ms. Sinetar replied: "You are

correct, you will definitely have an opportunity to review the draft investigative report including

all exhibits." *Id.* at ¶ 63.

> **D.**   **Doe Reviews the Investigation Report and Recommended Findings and Seeks a Hearing**

The COD Rules and Regulations provided that at the conclusion of an investigation, the

investigator would create a written report and make a non-binding, recommended finding of

responsibility based on the report. *Id.* at ¶ 64. The written report and the investigator's

recommendation would then be independently reviewed by a faculty member who had not been

involved in the case to "evaluate the report for completeness, ensure there is no bias, and that the

recommendation is supported by the facts of the case." *Id.* at ¶ 65. Once the investigator and

faculty reviewer agreed with the recommended findings and approved the report, the

complainant and respondent would have an opportunity to review the final report and to accept

or reject the recommended findings of responsibility. *Id.* at ¶ 66. If the complainant or

respondent did not agree with recommended findings of responsibility and if suspension or

expulsion were possible sanctions for the alleged conduct, a sexual misconduct hearing would be

convened. *Id.* at ¶ 67. All of this occurred.

On March 25, 2016, Ms. Sinetar emailed Doe and invited him to meet with her on March

31, 2016, to review the draft report and exhibits, and approve the notes from his third interview.

*Id.* at ¶ 68. Ms. Sinetar stated: "This meeting is an opportunity for you to review the draft report

for accuracy before we draft our recommended findings. . . . As we discussed, many students

find it helpful to have their advisors accompany them to this meeting." *Id.* at ¶ 69.[7]  Also on

March 25, 2016, Ms. Sinetar sent an email to the designated faculty reviewer, Professor Andrew

Whittle ("Professor Whittle"), as part of MIT's effort "to make sure the recommendations in the

report are supported by the evidence." *Id.* at ¶ 70.

On or about April 8, 2016, Professor Whittle completed his review of the Investigation

Report. *Id.* at ¶ 72.[8]  That same day, Ms. Sinetar sent an email to Kevin Kraft, the Director of

MIT's Office of Student Conduct ("Mr. Kraft"), regarding the Investigators' final report (the

"Investigation Report"). *Id.* at ¶ 75.  Ms. Sinetar stated: "I met with [Doe] and his advisor earlier

this afternoon, and they reviewed the report containing the Title IX Office's recommended

findings. . . .  During the meeting, I also reviewed available resources and provided an overview

of the COD process.  [Doe] is going to try to give us his decision regarding whether he agrees

with the recommended findings on Monday [April 11, 2016]." *Id.* at ¶ 76.

On April 11, 2016, Doe emailed Ms. Sinetar and stated that he had spoken with his

advisor and decided he would like the case to go to a hearing. *Id.* at ¶ 77.  On April 19, 2016,

Doe met with Mr. Kraft for an initial meeting regarding the hearing. *Id.* at ¶ 78.  Doe did not ask

to submit a written rebuttal to the Investigation Report. *Id.* at ¶ 79.

---

[7]     On March 31, 2016, Doe and his advisor met with the Investigators.  SUF at ¶ 71.
[8]     Specifically, the Investigation Report recommended that Doe be found responsible for the following policy
violations: (1) violation of the Harassment Policy during the 2013-2014 academic year based on Doe's course of
conduct towards Roe; (2) violation of the Sexual Misconduct Policy for engaging in nonconsensual sexual contact
with Roe during the February 2015 Incident; (3) violation of the Sexual Misconduct Policy for engaging in
nonconsensual sexual penetration of Roe during the February 2015 Incident; (4) violation of the 2014–2015 Sexual
Harassment Policy based on conduct during the February 2015 Incident; and (5) violation of the 2013–2014 Sexual
Misconduct Policy for performing oral sex on Roe while she was sleeping, which Doe admitted he had done. SUF at
¶ 73.  Doe admits that even after learning that the Investigation Report contained recommended findings of sexual
misconduct, he did not seek to engage an attorney as his advisor. *Id.* at ¶ 74.

**E.      The Hearing before the Panel of the COD's Sexual Misconduct
Subcommittee, and the Panel's Decision and Sanctions**

Pursuant to the COD Rules and Regulations, complaints of sexual misconduct were heard

by a panel comprised of three members of a sexual misconduct subcommittee of the COD,

including the Chair of the COD.  *Id.* at ¶ 80.  The purpose of a sexual misconduct hearing was

"to use the information in the investigation report and the statements of the complainant and

respondent to determine whether or not a policy violation occurred."  *Id.* at ¶ 81.  The scope of a

hearing was "limited to the points in dispute that had relevance to the determination of whether

or not a policy violation occurred."  *Id.* at ¶ 82.  After the hearing, the panel would decide, "using

a preponderance of the evidence standard and based on a majority," if the respondent was

responsible for committing violations of MIT policy.  *Id.* at ¶ 83.  If a party was found

responsible for a violation, the panel would decide the appropriate sanction to impose.  *Id.* at

¶ 84.  The sanctions available to be imposed by a panel upon a finding of a violation of the

Sexual Misconduct Policy included suspension and expulsion.  *Id.* at ¶ 85.  A written notice of

the decision would usually be provided to the respondent and the complainant no later than five

business days after the hearing.  *Id.* at ¶ 86.  All of this occurred.

On April 25, 2016, a hearing was held on Roe's Complaint before a panel comprised of

the COD Chair, Suzanne Flynn ("Professor Flynn"), another faculty member, Halston Taylor

("Professor Taylor"), and a residential life dean, Julie Rothhaar-Sanders ("Dean Rothhaar-

Sanders") (collectively, the "Panel").  *Id.* at ¶ 87.  Doe appeared at the hearing, accompanied by

his advisor, and Doe and Roe provided opening statements.  *Id.* at ¶ 88.  Doe did not request that

any witnesses appear at the Hearing.  *Id.* at ¶ 89.  Although Doe was informed that he would

have the opportunity to submit questions to the COD Chair to be posed to Roe, Doe did not

prepare any questions for Roe, nor did he request that any questions be posed to Roe.  *Id.* at ¶ 90.  The Panel asked Doe questions in a nonconfrontational manner.  *Id.* at ¶ 91.

On April 27, 2016, Doe received a letter from Professor Flynn providing the COD's decision on Roe's Complaint and setting forth the Panel's findings and rationale (the "Outcome Letter").  *Id.* at ¶ 92.  Professor Flynn reported that the Panel had found Doe responsible for three violations of the Institute's policies, namely two violations of the Sexual Misconduct Policy (specifically, that Doe engaged in nonconsensual sexual contact and nonconsensual sexual penetration during the February 2015 Incident), and one violation of the Harassment Policy based on Doe's conduct towards Roe during the 2013–2014 academic year.  *Id.* at ¶ 93.[9]  The Outcome Letter explained the basis for the Panel's findings, relying substantially on Doe's testimony.

With respect to the Panel's finding of nonconsensual sexual contact, the Panel found that Doe engaged in sexual contact with Roe (e.g., touching her buttocks and clitoris), and that because Doe initiated this contact, it was his responsibility to have obtained effective consent as defined in the Sexual Misconduct Policy.  *Id.* at ¶ 96.  The Outcome Letter stated that it was "undisputed that [Roe] was asleep and that [Doe] knew she was asleep a few minutes prior to [Doe's] initiation of sexual contact" (Doe also stated at the hearing that he "knew [Roe] was a heavy sleeper").  *Id.* at ¶ 97.  The Outcome Letter stated that even if the Panel "*accept[ed] [Doe's] recollection of events as accurate*," his assertion that Roe had given a "no" response to his question about continued work on the homework assignment and "mov[ed] slightly in bed"

---

[9]      The Panel did not address or adopt the Investigation Report's recommended findings that Doe violated the 2013–2014 Sexual Misconduct Policy based on the incident during the 2013–2014 academic year in which he performed oral sex on Roe while she was sleeping, or that Doe's conduct during the February 2015 Incident resulted in a violation of the 2014–2015 Harassment Policy.  *Id.* at ¶ 94.  As such, Doe admits that the Outcome Letter did not "rubber stamp" the Investigation Report, as he incorrectly alleged in his Complaint.  *Id.* at ¶ 95; *see* Compl. at ¶ 53.

were insufficient indicators of consent to any sexual activities.  *Id.* at ¶ 98 (emphasis added).

The Outcome Letter stated, "The Panel finds that [Roe's] actions did not constitute 'informed, freely and actively given, mutually understandable words or actions which indicate a willingness to participate in mutually agreed sexual activity,' which is the relevant standard for obtaining consent."  *Id.* at ¶ 99.

With respect to the Panel's finding of nonconsensual sexual penetration, the Panel found it was undisputed that Doe had initiated all three forms of penetration (oral, digital, and penile-vaginal), and that "it was [his] responsibility to have obtained effective consent *in each instance*."  *Id.* at ¶ 100 (emphasis added).  Again, the Panel focused *on Doe's testimony* in concluding that he had failed to obtain effective consent from Roe *before* he initiated *each* of these actions.  Regarding digital penetration, the Outcome Letter stated: "*You told* the investigator there were no words or actions from [Roe] indicating consent except for 'moaning kind of sound[s]' that she made *after* you penetrated her.  The Panel therefore found there was no effective consent *before* you initiated the digital penetration."  *Id.* at ¶ 101 (emphasis added).

Regarding oral penetration, the Outcome Letter stated: "*You told* the investigator that [Roe] did not respond verbally or physically while you were undressing her except to lift her bottom up so that you could take her pants off and lifting her shoulders so you could remove her bra.  You did not point to any words or actions of [Roe's] that demonstrated consent to oral sex.  The Panel therefore found that there was no effective consent before you initiated the oral penetration."  *Id.* at ¶ 102 (emphasis added).  Regarding sexual intercourse, the Outcome Letter stated, in pertinent part:

> *You respond* that after you engaged in oral sex, you kissed her and then initiated intercourse.  *You did not point to any words or actions that were indicative of consent* other than a brief kiss, which, given the circumstances of [Roe's] asleep or semi-asleep state, cannot be taken to be consent to further sexual activity. . . .  *You*

*also stated* to the investigator that [Roe] did not move or participate in the sex except to make a few "pleasured sounds" *after you had initiated the penetration*. The sexual misconduct policy specifies that silence or passivity does not constitute effective consent.  The Panel therefore found that there was no effective consent *before* you initiated the intercourse.

*Id.* at ¶ 103 (emphasis added).[10]

With respect to the Panel's finding on the Harassment Allegations, the Outcome Letter reiterated evidence adduced during the Investigation regarding Doe's conduct towards Roe during their first year, much of which was confirmed by Doe and/or corroborated by witnesses (e.g., refusing to allow her to become a sorority member, installing a GPS application on her phone, breaking a cell phone during an argument, hitting himself in front of her, and showing up at locations looking for her).  *Id.* at ¶ 105.  As evidence of interference with Roe's life at MIT, the Panel noted, among other things, that Doe's conduct had prompted Roe to seek assistance from VPR and change residence halls.  *Id.* at ¶ 106.  While the Panel acknowledged Doe's purported explanations for his conduct (e.g., it was not his intention to harm Roe, he was concerned about her due to prior medical issues), it nonetheless concluded that Doe's course of conduct toward Roe violated the Harassment Policy "because it created an intimidating living environment for [Roe], unreasonably interfering with her ability to benefit from MIT's educational programs." *Id.* at ¶ 107.

Based on the information the Panel reviewed and the information shared during the hearing, the Panel sanctioned Doe with disciplinary expulsion, meaning that his status as an MIT student was immediately and permanently terminated.  *Id.* at ¶ 108.

---

[10]     In addition to concluding that Doe had failed to obtain effective consent from Roe to prior to initiating sexual activity, the Panel "decided that it was more likely than not that Jane Roe was incapacitated by sleep or being in a semi-sleep state that made her unable to give effective consent to sexual contact."  SUF at ¶ 104.

F.      **Doe's Appeal**

Under the COD Rules and Regulations, expulsions were appealable to MIT's Chancellor on specified grounds, including that: (a) there exists substantive and relevant information that was not available at the time of the decisions; (b) there was a substantial departure from the COD rules and procedures that significantly affected the fairness of the process; (c) there was a material finding that formed the basis for the COD's decision was substantially against the weight of the evidence that was before the COD when it made the decision; and (d) the sanction was at significant variance with the range of sanctions appropriate in the situation. *Id.* at ¶ 109. The Chancellor would make a decision "based on the written appeal(s) providing the ground(s) on which the party is relying for appeal, and as much of the record of the COD hearing . . . of the case as the Chancellor determines it is appropriate to consider." *Id.* at ¶ 110.

On May 4, 2016, Doe submitted a written appeal of (1) the Panel's "decision regarding the charges of consensual contact and nonconsensual penetration," which he argued was based on "assumptions that were invalid," and (2) the expulsion sanction, which he argued was "too severe" (the "Appeal"). *Id.* at ¶ 111. Doe did not appeal on the grounds that there was a substantial departure from the COD Rules and Regulations that significantly affected the fairness of the Investigation. *Id.* at ¶ 112. More specifically for the purpose of responding to allegations in the Complaint, Doe did not claim in his Appeal that anyone at MIT had ever tried to "dissuade" him from using an attorney as an advisor (or that he would have done anything differently had his advisor been an attorney), or that he was entitled to or had been denied the opportunity to submit a "written rebuttal" to the Investigation Report. *Id.* at ¶ 113.

With respect to the findings of responsibility for violating the Sexual Misconduct Policy during the February 2015 Incident, Doe asserted in the Appeal that he "truly thought" he had obtained effective consent, but he admitted that it was "feasible" that he had "misunderstood and

misjudged [Roe's] intention that morning—that the actions [he] perceived to be effective consent were, in fact, somehow, simply movement of sleep or half-asleep." *Id.* at ¶ 114. Doe then stated: "For that misjudgment, I take responsibility. . . . [H]ad I known that [Roe] was in fact asleep I would certainly not have engaged in sexual activities with her. I really wish I had explicitly asked her [for consent] that morning, and this is a lesson I have taken away from this experience." *Id.* at ¶ 115.[11]

Regarding the Harassment Allegations, Doe stated that he was "willing to take partial responsibility" for his actions, and he did not argue that the Panel's finding was against the weight of the evidence. *Id.* at ¶ 117. Rather, Doe admitted that during his relationship with Roe, he had been "a bit controlling," had "improperly displayed his frustration at times," "did not know what was or was not appropriate," and "may have made her feel suffocated and interfered with her ability to fully participate in life at MIT during the one year of [their] relationship." *Id.* at ¶ 118.

On May 13, 2016, MIT's Chancellor issued a written decision on the Appeal affirming the Panel's findings and sanction (the "Decision"). *Id.* at ¶ 119. In the Decision, the Chancellor stated that the Panel's findings were not substantially against the weight of the evidence and that the sanction of expulsion was properly within the appropriate range of sanctions as set forth in the Sexual Misconduct Policy. *Id.* at ¶ 120.

---

[11]     At his deposition, Doe testified that through these remarks in his Appeal, he was "allowing for the possibility that [he] had made a misjudgment" and had a "misunderstanding" whether he had obtained effective consent from Roe.  SUF at ¶ 116.

## ARGUMENT

### A.    Standard of Review

A court should grant summary judgment when there is no genuine dispute as to material facts, and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "An issue is 'genuine' if the evidence of record permits a rational factfinder to resolve it in favor of either party."  *Leader v. President & Fellows of Harvard Coll.*, No. 16-10254, 2018 WL 3213490, at *3 (D. Mass. June 29, 2018).  "A fact is 'material' if its existence or nonexistence has the potential to change the outcome of the suit."  *Id.*

"The moving party bears the initial burden of informing the trial court of the basis for his motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, and affidavits, if any, that demonstrate the absence of any genuine issue of material fact."  *Id.*  "Mere allegations are not entitled to weight in the summary judgment calculus."  *López-Hernández v. Terumo Puerto Rico LLC*, 64 F.4th 22, 26 (1st Cir. 2023).  "If the movant meets that burden, the burden shifts to the nonmoving party, who must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor."  *Leader*, 2018 WL 3213490, at *3.  "More than 'conclusory allegations, improbable inferences, and unsupported speculation' is required to defeat summary judgment."  *See Doe v. Trustees of Boston Coll.*, 892 F.3d 67, 92–93 (1st Cir. 2018).

### B.    The Reasonable Expectations and Basic Fairness Tests

"It is well-established that the student-college relationship is contractual in nature."  *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 593 (D. Mass. 2016).  Two tests are relevant to a student's breach of contract claim against a university under Massachusetts law: reasonable

expectations and basic fairness.  *E.g.*, *Doe v. Williams Coll.*, 530 F. Supp. 3d 92, 117 (D. Mass. 2021).  When applying these tests, courts must also follow the well-established principle that "Massachusetts courts are chary about interfering with academic and disciplinary decisions made by private colleges and universities."  *Id.*

Under the reasonable expectations test, courts "look[] at the terms of the contract established between the college and the student and asks whether the reasonable expectations of the parties have been met."  *Williams Coll.*, 530 F. Supp. 3d at 117.  Specifically, courts ask "what meaning the party making the manifestation, the university, should reasonably expect the other party, the student, to give it."  *Boston Coll.*, 892 F.3d at 80; *see also*, *e.g.*, *Doe v. Stonehill Coll.*, 55 F.4th 302, 316 (1st Cir. 2022) ("the appropriate inquiry is whether the student's expectation, viewed objectively alongside the express terms of the contract, is based on the student's fair interpretation of the contract's provisions.").  In the context of disciplinary proceedings, courts "review the procedures followed to ensure that they fall within the range of reasonable expectations of one reading the relevant rules."  *Boston Coll.*, 892 F.3d at 80.

The basic fairness test, on the other hand, "does not turn on the specifics of the parties' contracts, but instead requires that disciplinary processes be 'conducted with basic fairness.'" *Williams Coll.*, 530 F. Supp 3d at 117; *see also Boston Coll.*, 892 F.3d at 87 (noting that duty to provide basic fairness in the context of disciplinary proceedings arises from the implied covenant of good faith and fair dealing present in all contracts).  However, when a university provides assurances of fairness in a disciplinary proceeding, the university's implied duty "becomes superfluous" and courts "focus[] on assuring compliance with the express contractual promise[s]."  *Id.* at 88.  Here, Section XII(A) of the COD Rules and Regulations contained an assurance of "the fairness of the process," and, for that reason, the Court's review of the breach

of contract claim should be limited to whether MIT followed and met the reasonable

expectations of the COD Rules and Regulations.  *See Williams Coll.*, 530 F. Supp. 3d at 120

(noting that defendant's obligation to provide a fair disciplinary proceeding arose from its policy

to ensure a "prompt, fair, and impartial investigation and resolution" and analyzing basic fairness

claim under express disciplinary procedures).

### C.   The Court Should Grant Summary Judgment on Doe's Breach of Contract Claim (Count I)

When Doe's imprecise claim for breach of contract (Count I) is distilled to its essence, he

appears to be asserting that MIT breached its policies and procedures in three ways when it

found him responsible for violating the Sexual Misconduct Policy and the Harassment Policy,

namely: (1) it "did not adhere to the requirement of the burden of proof" by "presuming [Roe's]

story was true" and "disregarding the facts and circumstances . . . showing consent"; (2) it did

not afford Doe an opportunity to submit a "written rebuttal" to the Investigation Report, which

caused the Panel to "rubber stamp[]" the report's conclusions; and (3) it "permitted gender bias

to be a motivating factor" behind his expulsion and "discriminat[ed] against [him] on the basis of

sex," thus depriving him of an "objective, impartial process."  Compl. at ¶¶ 67–72.  As explained

below, there are no genuine issues of material fact with respect to any of the foregoing

allegations, and no trier of fact could reasonably resolve them in Doe's favor.

#### 1.   The Panel's Findings Were Supported by a Preponderance of the Evidence.

Although the COD Rules and Regulations do not use the term "burden of proof," Doe

appears to be arguing that the Panel's findings that Doe violated the Institute's Sexual

Misconduct Policy and Harassment Policy were unsupported by a preponderance of the

evidence.  Any such argument is belied by the careful, evidentiary analysis set forth in the

Investigation Report and the Panel's Outcome Letter.

As detailed above at pages 15–17, the Panel's findings that Doe engaged in nonconsensual sexual contact and nonconsensual sexual penetration in violation of MIT's policies during the February 2015 Incident were based, in large measure, on undisputed facts and Doe's own testimony.  Doe admitted that he initiated sexual contact with Roe when he touched her buttocks and clitoris, and that he initiated oral, digital, and penile penetration of Roe's vagina.  Thus, the key issue for the Panel was whether Doe, as the party initiating these activities, had obtained Roe's "effective consent" to each activity through "informed, freely and actively given, mutually understandable words or actions which indicate a willingness to participate in mutually agreed upon sexual activity."  In reaching the conclusion that Doe had failed to obtain Roe's effective consent before engaging in each instance of sexual contact and sexual penetration, the Panel scrutinized and relied *on Doe's own testimony*; it did not, as Doe baselessly claims, "presum[e] [Roe's] story was true."  Compl. at ¶ 68.  The Panel concluded that Doe's description of sounds and movement from Roe, occurring while she was asleep or in a semi-sleep state and largely passive, were insufficient to show that Doe had reached an agreement with Roe to engage in an agreed upon sexual activity, through mutually understandable words or actions, before he began sexually touching and penetrating her.  In his Appeal, Doe acknowledged that he never "explicitly" asked for Roe's consent to any sexual intimacies, and he allowed that it was "feasible" that he "misunderstood and misjudged [Roe's] intention that morning."  MIT's effective consent policy, however, does not permit a party to avoid responsibility for sexual misconduct by relying upon a purported misunderstanding or misjudgment.  For effective consent to exist, the parties' words and actions must meet the requirements of MIT's policy.  Here, the Panel fairly concluded, relying almost exclusively on Doe's own testimony, that effective consent was not obtained by him during the February 2015

Incident, and there is no basis for Doe to allege that the COD did not adhere to the preponderance of the evidence standard.  *Id.* at ¶ 68.

The Panel's analysis with respect to the Harassment Allegations reflects a similar analysis of the totality of the evidence—not unthinking acceptance of Roe's testimony.  As discussed above, much of the evidence supporting the Harassment Allegations was confirmed by Doe and/or corroborated by witnesses, including evidence regarding Doe's controlling and sometimes aggressive conduct, which ultimately caused Roe to seek assistance from VPR and move to an all-women dormitory.  Notably, in his Appeal, Doe stated that he was "willing to take partial responsibility" for the Harassment Allegations, admitting that he had been "a bit controlling," had "improperly displayed his frustration at times," "did not know what was or was not appropriate" during his relationship with Roe, and "may have made her feel suffocated and interfered with her ability to fully participate in life at MIT during the one year of our relationship."  While the Panel acknowledged Doe's assertion that it was not his intention to harm Roe, the absence of malintent would not preclude a finding of harassment under MIT's policy, which defines harassment as "[a]ny conduct . . . that has the intent *or effect* of unreasonably interfering" with an individual's educational or work life at MIT, or that otherwise creates an "intimidating, hostile, or offensive" environment.  SUF at ¶ 11 (emphasis added).  As with its findings that Doe violated the Sexual Misconduct Policy, the Panel's finding that Doe violated the Harassment Policy was amply supported by the evidence.

In sum, the Outcome Letter reflects that the Panel did exactly what it was supposed to do: it weighed competing evidence and did not merely accept either party's account of events.  In so doing, it applied the preponderance of the evidence standard in accordance with MIT's policy. *See Stonehill Coll.*, 55 F.4th at 327 ("The preponderance of the evidence standard calls for a

weighing of the competing evidence").  While Doe may contend that a different decision-maker might have reached a different result or viewed the evidence differently, that is "not a relevant line of inquiry." *Williams Coll.*, 530 F. Supp. 3d at 99.  Doe's disagreement with the Panel's decision does not permit him to re-try the Institute's proceeding before a jury, as it is not the Court's role to weigh the evidence or to assess the credibility of the parties to a school disciplinary hearing. *Id.*; *Doe v. W. New Engl. Univ.*, 228 F. Supp. 3d 154, 180 (D. Mass. 2017); *Doe v. Brown Univ.*, 210 F. Supp. 3d 310, 313 (D.R.I. 2016); *Schaer v. Brandeis Univ.*, 432 Mass. 474, 479 n.9 (2000); *Doe v. Phillips Exeter Acad.*, No. 16-cv-396, 2016 WL 6651310, at *2 (D.N.H. Nov. 10, 2016).  The sole, relevant question is whether the Panel complied with the COD Rules and Regulations and applied the preponderance of the evidence standard, and it clearly did.

    2.    <u>Doe Did Not Have a Contractual Right to Submit a Written Rebuttal to the Investigation Report</u>

Doe's assertion that MIT "failed" to afford him the opportunity to submit a "written rebuttal" to the Investigation Report does not sustain his breach of contract claim because no reasonable student could expect that the COD Rules and Regulations granted any such right.  *See* Compl. at ¶ 70.

As the basis for his contention that he was entitled to submit a "written rebuttal" to the Investigation Report, Doe relies upon Sections XIII(F)(iii), XIII(F)(vi), and XIII(F)(vii) of the COD Rules and Regulations.  Roberts Aff., Exhibit 2 thereto, Plaintiff John Doe's Responses and Objections to Defendant's First Set of Interrogatories ("Doe's Answers to Interrogatories"), No. 7.  Doe's reliance on these provisions is misguided, as none of them create, or so much as hint at, any right to submit a "written rebuttal" to the final Investigation Report.  As the COD Rules and Regulations make clear, the Investigation Report is not prepared until the "*conclusion*

*of the investigation.*"  *See* Section XIII(F)(iv) ("At the conclusion of the investigation, the investigator creates a written report. . . .").  Section XIII(F)(iii), however, addresses each party's "opportunity to submit written statements, and an opportunity to respond to facts and statements gathered *during the investigation.*"  SUF at 14 (emphasis added).  Beyond dispute, MIT met any reasonable expectation created by Section XIII(F)(iii), as Doe was afforded multiple opportunities to submit statements, provide evidence, and respond to the facts and statements gathered *during the investigation* in each of his three interviews with the Investigators, as reflected in the First Interview Summary, Second Interview Summary, and Third Interview Summary.  Further, in March 2016, Ms. Sinetar offered Doe the opportunity to review her "notes from [her] interviews with the witnesses and materials submitted by the witnesses" and the "notes from [Roe's] third interview" (Doe decided to "skip" that opportunity), SUF at ¶¶ 60–62, and, as the investigation was concluding, she offered him the opportunity to approve the notes of his Third Interview and to review the Investigator's draft report for accuracy before the Investigators drafted their recommended findings.  SUF at ¶¶68–69.  In short, MIT fully complied with Section XIII(F)(iii).

Doe's reliance on Section XIII(F)(vi) and Section XIII(F)(vii) of the COD Rules and Regulations is equally unavailing.  These provisions provide only that after the completion of the written investigative report, the report will be "presented" to the parties for them to "view" (Section XIII(F)(vi)), and each party will have the opportunity to "accept" or "reject" the report's recommended findings (Section XIII(F)(vii)).  Both events indisputably occurred.

Viewed objectively, there is simply nothing in the COD Rules and Regulations that could have created a reasonable expectation that Doe had a right to submit a "written rebuttal" to the final Investigation Report, a point underscored by the fact that the word "rebuttal" appears

nowhere in the entirety of the COD Rules and Regulations.  Doe clearly understood this, as he admits that he never asked to submit a "written rebuttal" to the Investigation Report and never claimed in his Appeal that the COD Rules and Regulations granted him, or that he had been deprived of, any such right.  SUF at ¶ 113.  The evidence shows that Doe was afforded multiple opportunities to the respond to the allegations against him through the Investigation and the live hearing, and Doe cannot sustain his breach of contract claim by asserting that he was not afforded the opportunity to submit a "written rebuttal" to the final Investigation Report.  *See Cloud v. Trustees of Boston Univ.*, 720 F.2d 721, 724 (1st Cir. 1983) (where university's disciplinary rules stated that law students were subject to general university procedures, law student's alleged expectation to have hearing governed by rules applicable solely to law students was not reasonable).

> 3.   Doe's Allegations of "Gender Bias" Are Unfounded and Cannot Form the Basis of a Breach of Contract Claim

In his Complaint, Doe recites a litany of what has become now-familiar, boilerplate language in support of claims under Title IX, e.g., that the "female's allegations" were treated as "presumptively true," that the disciplinary process was "anti-male in operation," that proceedings were motivated and guided by "radical feminist anti-male bias," and that the April 2011 Dear Colleague Letter from the Office for Civil Rights ("OCR") gave "preferential treatment" to females and "made it more difficult for males accused of sexual assault to defend themselves." Compl. at ¶¶ 3, 28, 52, 71.  Doe's Complaint, however, does not assert a Title IX claim, and any such claim is time-barred.  Faced with that insurmountable bar, Doe attempts to shoehorn his allegations of "gender bias" into a breach of contract claim by reference to the Institute's general policy statement that it is "committed to the principle of equal opportunity" and "does not discriminate" based on sex.  Compl. at ¶¶ 20, 71.  This fails for two reasons.

First, although they are reflective of MIT's core values, Doe cannot repackage a time-barred Title IX sex discrimination claim as a contract claim by invoking the Institute's anti-discrimination policy statements. *G. v. Fay School, Inc.*, 931 F.3d 1, 12 (1st Cir. 2019) (student who sued school for failure to provide accommodations could not sustain a breach of contract claim by relying on statements of school's "core values," including statements regarding "mutual respect and civility," "making a positive difference," and "respect[ing] the rights of others," which were "insufficiently definite to form a contract); *see also Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 370 (S.D.N.Y. 2016) (statement in handbook that university was "committed to providing an environment free from gender-based discrimination and harassment" could not form the basis for a breach of contract action because "'general statement' of a university's adherence 'to existing anti-discrimination laws' 'does not create a separate and independent contractual obligation'"); *David v. Neumann Univ.*, 187 F. Supp. 3d 554 (E.D. Pa. 2016) (school's anti-discrimination policy did not constitute enforceable contract *per se* between the university and the student).[12]

Second, even if Doe's allegations could provide the underpinnings of a breach of contract claim, the evidence, including Doe's deposition testimony, shows that they are wholly unfounded. As detailed above, the COD's conclusions that Doe violated the Institute's policies were based on careful analysis of the evidence and focused largely on Doe's admissions, and there is no basis to contend that any party's testimony was viewed as presumptively true or presumptively false. Further, Doe repeatedly admitted at his deposition that his allegations of

---

[12]   For the similar reasons, Doe cannot maintain a breach of contact claim by relying upon the statement in the Mind and Hand Book that provides, "[MIT] expects its students to uphold the highest standards of respect, integrity, and civility. Within this context, the Committee on Discipline (COD) was created to resolve alleged violations of policies and/or community standards by a student or former student in a way that is objective and educational, not legalistic or adversarial." *See* Compl. at ¶¶ 19, 67. This generalized, aspirational statement is too vague to form a certain, definite, and enforceable promise. *See Fay Sch.*, 931 F.3d at 12.

bias have no evidentiary foundation.  Among other things, Doe admitted that he cannot point to any evidence that there was a causal link between his male gender and the outcome of the COD hearing, that gender bias was a motivating factor behind his expulsion, that the Investigators or Panel ever said or did anything to indicate they harbored a bias against him, that any provision in the COD Rules and Regulations placed him at a disadvantage because of his gender, or that so-called "radical feminist anti-male bias" influenced the conclusions of the Investigation Report or the hearing.  SUF at ¶¶ 121–130.

In sum, where Doe admits that his bald allegations of "gender bias" are bereft of any evidentiary support, they cannot sustain his claim for breach of contract.  *See, e.g.*, *Boston Coll.*, 892 F.3d at 91 (it is insufficient to "merely rest on superficial assertions of discrimination" and evidence must establish that "particular circumstances suggest that gender bias was a motivating factor" in the outcome of a disciplinary process).

### D. The Court Should Grant Summary Judgment on Doe's Promissory Estoppel Claim (Count II)

"It is well-established that recovery under a quasi-contract theory is not available where there is a written contract governing the same subject matter."  *Brandeis Univ.*, 177 F. Supp. 3d at 612.  Here, Doe contends that the purported promises on which he bases this claim are found exclusively in the terms of MIT's written policies, namely MIT's Mind and Hand Books and the COD Rules and Regulations.  *See* Roberts Aff., Exhibit 2 thereto, Doe's Answers to Interrogatories, Nos. 3, 4, and 8, Exhibit 3 thereto, Plaintiff John Doe's Supplemental Answers to Defendant's First Set of Interrogatories ("Doe's Supplemental Answers to Interrogatories"), Nos. 4 and 8.  Because the only source of the alleged promises upon which Doe relies is found in written policies, Count II should be dismissed.  *See*, *e.g.*, *Brandeis Univ.*, 177 F. Supp. 3d at 612–

13 (noting that "the existence of a written contract demonstrate[s] the parties' intention that it would govern their intricate transaction").[13]

### E.   The Court Should Grant Summary Judgment on Doe's Basic Fairness Claim (Count III)

While the precise contours of a basic fairness claim are not clearly defined, basic fairness is chiefly concerned with whether a university "acted in good faith and on reasonable grounds." *Stonehill Coll.*, 55 F.4th at 331.  There are at least two principal threads to the basic fairness inquiry.  *Brandeis Univ.*, 177 F. Supp. 3d at 602; *see also*, *e.g.*, *Stonehill Coll.*¸ 55 F.4th at 331 (collecting cases).  "The first is procedural fairness—that is, whether the process used to adjudicate the matter was sufficient to provide the accused student a fair and reasonable opportunity to defend himself."  *Brandeis Univ.*, 177 F. Supp. 3d at 602.  "The second is substantive fairness—that is, even if the procedure was fair, whether the decision was unduly arbitrary or irrational, or tainted by bias or other unfairness."  *Id.*

With respect to procedural fairness, MIT afforded procedural protections to Doe that went well beyond the "minimum level of fair play" required by basic fairness.  *Sonoiki v. Harvard Univ.*, No. 19-CV-12172, 2020 WL 3416516, at *13 (D. Mass. June 22, 2020).  Among other things, the undisputed record reveals that MIT notified him of Roe's Complaint (including her allegations about the February 2015 Incident and the Harassment Allegations); advised him of his right to have an advisor (including an attorney) present during any meeting in the investigative or hearing processes; provided him three meetings with Investigators to provide his account of events; allowed him multiple opportunities to respond to facts and statements gathered during the Investigation; invited him to review statements and evidence provided by

---

[13]    Even if Doe's promissory estoppel claim was cognizable, Count II should still be dismissed for the same reasons Count I and Count III should be dismissed.

witnesses (which he declined); provided him the opportunity to review a draft investigative

report for accuracy; allowed him to decide whether to accept or reject the recommended findings

in the Investigation Report; provided him a live hearing at which he was permitted to give

opening remarks, have questions posed to Roe (which he declined), and answer questions from

the Panel; and afforded him a right to appeal the outcome on four separate grounds (he appealed

on just two).  With respect to substantive fairness, there is no credible basis for Doe to contend

that the Panel's findings were "unduly arbitrary or irrational, or tainted by bias or other

unfairness."  Compl. at ¶ 87.  To the contrary, the evidence firmly establishes the reason, care,

and thought behind the Panel's findings, for the reasons discussed at length above.  While Doe

may disagree with those findings, his disagreement affords no basis for a basic fairness claim.

Against this framework of unmistakable procedural and substantive fairness, Doe

struggles to argue that he was deprived of basic fairness.  He begins by repeating the same,

unfounded allegations that provided the underpinnings of his infirm breach of contract claim

(e.g., MIT presumed he was not telling the truth; MIT failed to afford him an opportunity to

submit a "written rebuttal" to the Investigation Report; he was found responsible for sexual

misconduct despite a "lack of evidence").  These empty allegations fare no better under a basic

fairness claim.  Grasping at straws, Doe further argues that he was denied basic fairness by

claiming that (1) the Panel "rubber-stamped" the Investigation Report; (2) he was "dissuaded"

from hiring an attorney as his advisor and then "forced" to appear at the Hearing "without an

attorney advisor"; and (3) he was "denied the right to an effective appeal" because MIT

"unreasonably circumscribe[ed] the grounds for appeal."  Compl. at ¶¶ 88–95.  None of these

arguments provides the foundation for a basic fairness claim.

### 1.   The Panel Did Not "Rubber Stamp" the Investigation Report.

Doe's assertion that the Panel unthinkingly "rubber-stamped" the Investigation Report finds no support in the evidence.  At the most basic level, a simple comparison of the number of recommended findings in the Investigation Report (five) with number of actual findings in the Outcome Letter (three) belies the notion that the Panel automatically approved the Investigation Report.  After Doe was confronted with this fact at his deposition, the following exchange occurred with MIT's counsel:

> MIT's Counsel:        So my question is: You would agree with me that the COD outcome letter does not simply rubber stamp the investigative report, correct?
>
>                       Doe's Counsel: Objection.  Calls for a legal opinion.
>
> Doe:                  Sure.

Roberts Aff., Exhibit 1 thereto, Doe Dep. at 153:10–15.  Moreover, the thoughtful analysis provided by the Panel, especially regarding the examination of Doe's testimony as it applied to the Institute's policy on effective consent, refutes the idea of "rubber-stamping."

### 2.   Doe Chose Not to Use an Attorney as His Advisor, Even Though He Knew He Could Do So.

Regarding Doe's contention that he was supposedly "dissuaded" from having an attorney serve as his advisor, MIT is compelled to note that his story has changed no fewer than four times during this litigation.  In his Complaint, which Doe testified he reviewed and was "true and accurate," Doe originally claimed that it was either "*the Title IX investigator*" (singular) who "specifically advised [him] not to hire an attorney," or "*the investigators*" (plural) who "strongly dissuaded [him] from hiring an attorney to serve as his advocate (sic)."  Compl. at ¶¶ 50, 88(a) (emphasis added).  At his deposition, however, Doe admitted that neither of these allegations was true.  Robert Aff., Exhibit 1, Doe Dep. at 41:7–43:9.  In his response to MIT's interrogatories,

Doe offered three differing sworn answers to the interrogatory that asked to him identify "any communication by MIT . . . concerning an attorney serving as [his] advisor during the Investigation."  In his initial answer (dated March 29, 2023), Doe referenced only the *provisions of the COD Rules and Regulations* that mention advisors (Sections IV, V, and XIII), but he did not otherwise identify a single communication with *anyone* at MIT.  *See* Roberts Aff., Exhibit 2 thereto, Doe's Interrogatory Answers, No. 6.[14]  Three months later, Doe served a "supplemental" answer in which he offered an entirely new story, claiming for the first time that it was *Ms. Rankin* who supposedly "discouraged him from doing so by stating that a lawyer could not speak during any part of the proceeding and would 'not be useful.'"  *See* Roberts Aff., Exhibit 3 thereto, Doe's Supplemental Answers to Interrogatories, No. 6.  After another month (and on the eve of his deposition), Doe served an "amended supplemental" answer, in which he further embellished what Ms. Rankin supposedly said, contending that she stated that an attorney "would not be worth the cost for the limited role."  *See* Robert Aff., Exhibit 4, Plaintiff John Doe's Amended Supplemental Answers to Defendant's First Set of Interrogatories, No. 6.[15]

Even if this Court were to indulge Doe and accept his latest version of events, it would not sustain a basic fairness claim for two reasons.  First, there is no dispute that MIT informed

---

[14]     Doe also objected to this interrogatory, contending that the "information [was] within [MIT's] possession and control."  Roberts Aff., Exhibit 2 thereto, Doe's Interrogatory Answers, No. 6.  The information within MIT's possession and control, however, reflects that when Doe was expelled, he had told his mother (who told Mr. Kraft) that he "did not know" that his advisor could be an attorney.  Rankin Aff., Exhibit 10 thereto.  Of course, any claim that Doe "did not know" that his advisor could be an attorney was untrue, as Doe admits that he knew his advisor could be an attorney.

[15]     Any assertion by Ms. Rankin that advisors play a "limited role" and "could not speak" on behalf of their advisee is wholly consistent with the COD Rules and Regulations.  *See* Rankin Aff., Exhibit 2 thereto, Section V(B).  As for any alleged comment about "cost," it is self-evident that hiring an attorney advisor would impose some amount of "cost" on Doe.  In contrast to Doe's shifting versions of events, Ms. Rankin is clear that she did not say or do anything to discourage Doe from using an attorney as his advisor, or to convey that an attorney would not be useful or worth the cost.  Rankin Aff. at ¶ 7.  In fact, in any matter involving allegations of sexual misconduct between students, Ms. Rankin welcomes and appreciates when complainants and respondents retain attorneys as their advisors because they are often useful in assisting students in navigating what can be an emotionally trying process.  *Id.*

Doe, multiple times, of his right to be accompanied by an advisor at all disciplinary proceedings and that his advisor could be an attorney, a right that is not required by basic fairness unless provided for in a school's policy. *Williams Coll.*, 530 F. Supp. 3d at 120 ("Basic fairness does not require a live hearing, quasi-cross-examination, access to evidence, or even the opportunity for a student accused of misconduct to seek advice or counsel"). Doe also admitted that before his first meeting with Ms. Rankin he reviewed Section IV(D) of the COD Rules and Regulations, which explicitly provides that attorneys may serve as advisors in sexual misconduct cases, but that he nonetheless chose to select a non-lawyer, MIT employee to serve as his advisor. The evidence further shows that Doe chose to participate in investigative interviews without the presence of his chosen advisor, even though he was reminded that he could, and was encouraged to have, his advisor present. Indeed, even after Doe learned that the Investigators and faculty reviewer were recommending multiple findings of responsibility, Doe chose to move forward to a hearing without obtaining an attorney as his advisor; no one "forced" him to do so. In short, Doe was a 21-year-old adult, and it was up to him to decide who he wanted to use as an advisor, and how he wanted to use that advisor.

Second, any complaint by Doe about his advisor has been waived. After Doe was informed of the COD's expulsion decision, he submitted his Appeal in accordance with MIT's policy, which explicitly afforded him the opportunity to raise concerns about perceived procedural issues. In his Appeal, Doe did not contend that he had been denied the opportunity to use an attorney as an advisor, that anyone at MIT ever tried to dissuade him in any way from using an attorney as an advisor, or that he would have done anything differently if his advisor had been an attorney. If Doe had any valid concerns on these points—and, to be clear, he does not—the time to raise them was in real time in 2016, as part of the process contemporaneously

afforded by MIT, so that any concern could have been addressed.  Doe cannot sit silent for over

five years and then claim in litigation that his right to use an attorney as an advisor was impaired

in some way.  Concluding otherwise would contravene the most fundamental concept of basic

fairness.

3.     MIT Did Not "Unreasonably Circumscribe" the Grounds for Appeal.

As the COD Rules and Regulations plainly state, appeals may be made on four grounds:

(1) there exists substantive and relevant information that was not available at the time of the

decision; (2) there was a substantial departure from the COD Rules and Regulations that

significantly affected the fairness of the process; (3) a material finding that formed the basis for

the decision was substantially against the weight of the evidence that was before the COD when

the decision was made; and (4) the sanction was at significant variance with the range of

sanctions appropriate in the situation.  As such, the COD Rules and Regulations afforded robust

ability to provide new evidence that had been unavailable during the investigation, to address

violations of rules that affected "fairness," to question the Panel's conclusions in view of the

evidence, and to contest the severity of the sanction.  Doe, of course, was aware of all of the

potential grounds for appeal and had the opportunity to assert whichever ones he wished, but he

chose to assert only two.  Beyond Doe's conclusory assertion that his right of appeal was

somehow "unreasonably circumscribed," Doe points to nothing, and there is nothing, that

deprived him of basic fairness in connection with his appeal.[16]

---

[16]     In his Complaint, Doe cites to a decision in which the trial court noted that the appellate rights at another university did not reference "the ability to appeal on the ground that the [fact-finder's] decision was not supported by the evidence. . . ."  Compl. at ¶ 92.  The COD Rules and Regulations, however, expressly included the ability to appeal on those grounds.  Rankin Aff., Exhibit 2 thereto, COD Rules and Regulations at § XII(A).

## CONCLUSION

For the reasons stated above, Defendant Massachusetts Institute of Technology respectfully requests that this Court grant summary judgment in its favor on all counts in Doe's Complaint.

Respectfully submitted,

**MASSACHUSETTS INSTITUTE OF TECHNOLOGY**

By its attorney,

 */s/ Scott A. Roberts*
Scott A. Roberts (BBO No. 550732)
            *sroberts@hrwlawyers.com*
Hirsch Roberts Weinstein LLP
24 Federal Street, 12th Floor
Boston, MA 02110
Phone: (617) 348-4300
Fax: (617) 348-4343

Dated: December 8, 2023

## CERTIFICATE OF SERVICE

I, Scott A. Roberts, certify that this document, filed through the Electronic Case Filing (ECF) system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on December 8, 2023.

 */s/ Scott A. Roberts*
Scott A. Roberts (BBO No. 550732)